**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

| | |
|---|---|
| JANE DOE (A.G.B.), AN INDIVIDUAL Plaintiff | Defendants |
| v. | |
| WYNDHAM HOTELS & RESORTS, INC., WYNDHAM HOTEL GROUP, LLC, RAMADA WORLDWIDE, INC., RAMADA INN FRANCHISEE, LP, CHOICE HOTELS INTERNATIONAL, INC., PRAMUKHRAJ IRVING, LLC, LQ MANAGEMENT LLC, LA QUINTA FRANCHISING LLC, LA QUINTA HOLDINGS INC., CPLG TX PROPERTIES ("CPLG TX") f/k/a BRE/LQ TXGP, LLC ("BRE LQ"), and AARON & ALVIN, LLC | CIVIL ACTION NO: |

**ORIGINAL COMPLAINT**

COMES NOW Plaintiff Jane Doe (A.G.B.), by and through the undersigned counsel, and respectfully submits her Original Complaint for damages.

**SUMMARY**

1.     A.G.B. is a survivor of sex trafficking. Her trafficker repeatedly and regularly trafficked her at a limited number of his preferred hotels, including: (1) the property located at 8205 Esters Boulevard, Irving, Texas 75063 ("Esters Property"), which operated as a Ramada Inn and later as a Quality Inn during the trafficking period; (2) the La Quinta located at 8300 Carpenter Freeway, Irving, Texas 75039 ("Carpenter Freeway La Quinta"); and (3) the La Quinta located at 14925 Landmark Boulevard, Dallas, Texas 75254 ("Landmark La Quinta"). He also frequently trafficked her at the Motel 6 located at 2380 W Northwest Highway, Dallas Texas, which is the subject of a related lawsuit previously in this District.

1

2.    At the start of A.G.B.'s trafficking period, the Esters Property was jointly operated as a Ramada Inn by Wyndham Hotels & Resorts, Inc., Wyndham Hotel Group, LLC, and Ramada Worldwide, Inc., (collectively "the Wyndham Brand Defendants" or "Wyndham") and Global Hospitality, LP ("Ramada Inn Franchisee"). During this period, Ramada Inn Franchisee provided "boots on the ground" at the Esters Property, while the Wyndham Brand Defendants directly participated in and controlled relevant hotel operations, including by playing a central role in the rental of rooms and through intimate involvement in aspects of operations related to the detection of and response to sex trafficking. Ramada Inn Franchisee also acted as the agent of the Wyndham Brand Defendants when operating the Esters Property as a Ramada Inn.

3.    During A.G.B.'s trafficking period, Ramada Inn Franchisee sold the Esters Property to Pramukhraj Irving, LLC ("Pramukhraj"), after which the hotel converted to a Quality Inn, a Choice Hotels sub-brand. During this period, the Esters Property was jointly operated by Choice Hotels International, Inc. ("Choice") and Pramukhraj. Pramukhraj provided on-site operations, while Choice directly participated in and exercised control over hotel functions, including room-rental practices and policies critical to identifying and responding to sex trafficking. In operating the Esters Property as a Quality Inn, Pramukhraj also acted as Choice's agent.

4.    On information and belief, the Carpenter Freeway La Quinta was jointly operated by La Quinta Holdings Inc., LQ Management, LLC, La Quinta Franchising LLC, and predecessor entities to Wyndham Hotels & Resorts, Inc. (collectively, "the LQ Brand Defendants"), together with Aaron & Alvin, LLC ( "LQ Franchisee"). LQ Franchisee provided the on-site, day-to-day operations at the Carpenter Freeway La Quinta, while the LQ Brand Defendants directly participated in and exercised control over core aspects of hotel operations, including room-rental

2

practices and policies central to identifying and responding to sex trafficking. In operating the Carpenter Freeway La Quinta, LQ Franchisee also acted as the agent of LQ Brand Defendants.

5.      On information and belief, the Landmark LQ was a corporate property owned by CPLG TX Properties ("LQ Property Defendant") and jointly operated, managed, and controlled by the LQ Brand Defendants and the LQ Property Defendant, all of whom were affiliated entities subject to common control.

6.      As detailed below, each Defendant derived benefit use of its respective hotel(s) for sex trafficking, including the trafficking of A.G.B. Despite obvious and recurring indicators of trafficking at its respective hotel(s), each Defendant continued to rent rooms to traffickers and operated its hotel(s) in ways that enabled trafficking to flourish—creating a haven where traffickers could work undisturbed by hotel staff and with minimal risk of detection or traceability.

7.      A.G.B. thus brings this civil action under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1581 *et seq.*, and 18 U.S.C. § 2255 to recover for the harms and losses she suffered because of the sex trafficking she endured at Defendants' hotels—trafficking that each Defendant facilitated and from which each Defendant benefited.

## **PARTIES**

8.      A.G.B. is a natural person who is currently a resident and citizen of Texas. She will be filing a motion to proceed under a pseudonym shortly after filing this lawsuit. Given the nature of the allegations in this lawsuit, there is a collective, recognized, and compelling interest in not publicly revealing the identity of A.G.B.

9.      Wyndham Hotels & Resorts, Inc. ("WHR"), f/k/a Wyndham Worldwide Corporation, is a for-profit Delaware corporation conducting business in Texas. WHR is the successor entity to the hotel business of Wyndham Worldwide Corporation and its former

subsidiaries. Defendant WHR is responsible, as successor, for all liabilities of Wyndham Worldwide Corporation and its predecessor subsidiaries related to hotel operations and franchising. All references to WHR include the acts and omissions of predecessor entities for which WHR is responsible, including Wyndham Worldwide Corporation and its former subsidiaries.

10.     Wyndham Hotel Group, LLC ("WHG") is a for-profit Delaware corporation conducting business in Texas. On information and belief, WHG is a wholly owned subsidiary of WHR and a former subsidiary of Wyndham Worldwide Corporation.

11.     Ramada Worldwide, Inc. ("RWI") is a for-profit Delaware corporation conducting business in Texas.

12.     Ramada Franchise System, Inc. ("RFS") is a for-profit Delaware corporation conducting business in Texas.

13.     WHR, WWG, RWI, and RFS are affiliated entities under common ownership and control and are referred to collectively as "the Wyndham Brand Defendants" or "Wyndham." On information and belief, the Wyndham Brand Defendants jointly participated in the operation, oversight, and control of the Esters Property during the period when it was branded and operated as a Ramada Inn.

14.     Global Hospitality, LP ("Ramada Inn Franchisee") is a for-profit Washington limited partnership doing business in Texas. Ramada Inn Franchisee owned and participated in operation of the Esters Property during the first portion of A.G.B.'s trafficking period when the hotel was branded and operated as a Ramada Inn.

15.     Choice Hotels International, Inc. ("Choice") is a for-profit Delaware corporation conducting business in Texas. On information and belief, Choice participated in the operation,

oversight, and control of the Esters Property during the period when it was branded and operated as a Quality Inn.

16.    Pramukhraj Irving, LLC ("Pramukhraj" or "Choice Franchisee") is a Texas limited liability company doing business in Texas.  Pramukhraj owned and participated in operation of the Esters Property during the second portion of A.G.B.'s trafficking period, including when the hotel was branded and operated as a Quality Inn.

17.    LQ Management LLC ("LQ Management") is a for-profit Delaware limited liability company doing business Texas.

18.    La Quinta Franchising LLC ("LQ Franchising") is a for-profit Nevada limited liability company doing business in Texas.

19.    La Quinta Holdings Inc. ("LQ Holdings") is a Delaware corporation doing business in Texas.  At relevant times, it was an "owner, operator, and franchisor of select-service hotels . . . under the La Quinta brand."[1]

   a.   On information and belief, through a 2013 corporate reorganization, LQ Holdings acquired the assets and liabilities of predecessor La Quinta entities that had previously owned, operated, managed, and controlled the Landmark La Quinta.[2] LQ Holdings is responsible for the wrongful acts of the predecessor LQ entities, and their agents and alter-egos, that operated, managed, and controlled the Landmark La Quinta prior to this reorganization. All references to LQ Holdings include any predecessor LQ entities.

   b.   On information and belief, at all relevant times LQ Management and LQ Franchising were wholly owned subsidiaries of LQ Holdings or predecessor entities for which LQ Holdings is the successor. LQ Management and LQ Franchising were subject to the control of LQ Holdings.

   c.   Following this reorganization, LQ Holdings—together with the wholly owned subsidiaries which are its agents or alter-egos—owned, operated,

---

[1] https://www.annualreports.com/HostedData/AnnualReportArchive/l/NYSE_LQ_2016.pdf
[2] https://www.sec.gov/Archives/edgar/data/1594617/000119312515104620/d859384d424b4.htm

5

and managed the Landmark La Quinta until 2018 when Defendant WHR acquired the management and franchising businesses of LQ Holdings.

20. Defendant WHR— the current owner of the La Quinta brand—is also named in this action as a successor entity liable for the franchising, management, control, and operation of the Subject La Quinta Hotels. Specifically:

    **a.** On information and belief, in or around 2018, WHR and/or its predecessor entities acquired La Quinta's management and franchise businesses, including interests in numerous Texas hotels that the Wyndham Brand Defendants operated, managed, franchised, and/or controlled.

    **b.** WHR is the successor in interest to LQ Holdings and other predecessor La Quinta entities with respect to the operation of the Subject La Quinta Hotels. On information and belief, WHR and/or its predecessor entities— whose liabilities WHR assumed—expressly assumed liabilities associated with La Quinta's management and franchise businesses. In addition, there was continuity of operations and ownership between LQ Holdings, other predecessor La Quinta entities, and WHR.

    **c.** WHR is therefore responsible for the wrongful acts of the predecessor La Quinta entities (and their agents and alter egos) that operated, managed, and controlled the Subject La Quinta Hotels.

    **d.** Any reference to WHR as part of the "LQ Brand Defendants" or the "LQ Defendants" encompasses all predecessor entities for which WHR is liable as successor.

21. LQ Management, LQ Franchising, LQ Holdings, and WHR—in its capacity as successor—are referred to collectively as the "LQ Brand Defendants."

22. CPLG TX Properties ("CPLG TX" or "LQ Property Defendant") f/k/a BRE/LQ TXGP, LLC ("BRE LQ") is a Delaware limited liability company conducting business in Texas. At all relevant times, LQ Property Defendant owned the Landmark La Quinta and, on information and belief, participated in its operation, control, and/or management through inter-organization agreements with the LQ Brand Defendants.

6

23.     The LQ Brand Defendants and the LQ Property Defendant—which, on information and belief, are affiliated entities under common ownership and control—are referred to collectively as the "LQ Defendants."

24.     Aaron & Alvin, LLC ( "LQ Franchisee") is a Texas limited liability company doing business in Texas. At all relevant times, LQ Franchisee owned the Carpenter Freeway La Quinta and, on information and belief, operated, controlled, and/or managed it jointly with the LQ Brand Defendants through the La Quinta franchising system.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA and 18 U.S.C. § 2255.

26.     The Court has personal jurisdiction over all Defendants because, for claims under 18 U.S.C. § 2255, Congress authorized nationwide service of process and nationwide jurisdiction.

27.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, pursuant to 28 U.S.C. §§ 1391(c)(2), all Defendants are residents of the Eastern District of Texas.

## FACTS

**I.     A.G.B. is a Survivor of Unlawful Sex Trafficking, which was Facilitated by Hotels Owned, Operated, Managed, and Controlled by Defendants.**

28.     A.G.B. is a victim of sex trafficking under 18 U.S.C. §1591(a) and §1595(a). Her trafficking began in 2012, when she was just 15 years old, and continued through approximately 2016. A.G.B.'s trafficker used physical violence and psychological coercion to cause her to engage in commercial sex for his financial benefit.

29.     In 2012, A.G.B. ran away after experiencing abuse in her home at the hands of her mother's boyfriend. While she was in this vulnerable state, her trafficker targeted her. He initially provided her with food and clothing but then promptly began instructing her to engage in

7

commercial sex for his financial benefit. Her trafficker was a gang member who also trafficked other victims. He carried a gun and would hit her and force her to take ecstasy to gain compliance. He would limit her access to food, deprive her of sleep as she was required to see johns at all time of the day and night, and keep her confined in hotel rooms for extended periods without access to necessities. He set quotas for how much she was required to earn.

30.     In 2016, A.G.B. was able to escape when her trafficker fell asleep, leaving her with access to his money. She was able to pay someone to take her to a motel where she called her sister who picked her up and helped her to escape. Even after her escape, her trafficker continued to contact her and say he was going to come get her, but she was able to keep him from finding out her location.

31.     Between 2012 and 2016, A.G.B. was repeatedly and regularly trafficked as a minor at hotels in the Dallas metro area. Her trafficker had four preferred hotels that he would frequently rotate A.G.B. and other victims between, keeping A.G.B. at each hotel for as long as a week or two before moving her to the next. Three of these hotels were the Carpenter Freeway, the Landmark La Quinta, and the Esters Property (collectively "the Subject Hotels"). The fourth was a Dallas-area Motel 6 that is the subject of a related lawsuit in this District.

32.     A.G.B.'s trafficker repeatedly returned to the Subject Hotels because he was able to operate without interference from hotel staff and in conditions that allowed him to minimize the risk of detection by law enforcement or traceability.

33.     A.G.B.'s trafficker used a consistent *modus operandi* across all Subject Hotels, producing recurring and readily observable indicia of trafficking at each property.  These matched with the industry recognized "red flags" of trafficking.

34.    Throughout the period in which A.G.B. was trafficked as a minor at the Subject Hotels, hotel staff had repeated opportunities to observe her. She encountered the same employees—including front-desk and housekeeping staff—on multiple occasions, both with her trafficker and with other trafficking victims. She appeared consistent with her age, and it would have been obvious to any reasonable observer that she was a minor. She looked like a school-aged child who should have been in school, yet she was present at Defendants' hotels amid unmistakable signs of commercial sex activity.

## II.    The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.

35.    The widely known and pervasive relationship between sex trafficking and the hotel industry cannot be disregarded and necessarily shapes what each Defendant knew or should have known regarding the trafficking at the Subject Hotels, including the trafficking of A.G.B.

36.    Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[3] For years, sex traffickers have been able to reap their profits with little risk when attempting to operate within hotels.[4] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[5] Hotels have been found to account for over 90% of the commercial exploitation of children.[6]

---

[3] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019),https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[4]    *See    Human    Trafficking    in    the    Hotel    Industry*,    Polaris    Project    (Feb.    10,    2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help    Save    A    Trafficking    Victim's    Life    With    Your    Hotel    Room    Pic*,    Huffington    Post    (June    2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

[5] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[6] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

37.     Because of this link between hotels and sex trafficking, government bodies, law enforcement agencies, non-profits, and hotel trade associations—including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, EPCAT, and others—have devoted significant efforts to intervening and educating the hotel industry, including each of the Defendants, on best practices for identifying and responding to sex trafficking.[7]

38.     This resulted in the development of "red flags" of sex trafficking. Law enforcement agencies and other organizations with subject-matter expertise identified specific indicators of the presence of sex trafficking at a hotel. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel. These recurring indicators are known as "red flags" of sex trafficking.

39.     Recognized "red flags" of sex trafficking that are considered general indicators of trafficking that can be observed by staff throughout a hotel[8] include:

- individuals who appear to be with a significantly older "boyfriend" or in the company of much older males;
- a group of girls who appears to be traveling with an older female or male;
- a group with similar tattoos, which can indicate "branding" by a trafficker;
- individuals showing fear, anxiety, tension, submissiveness and/or nervousness;
- individuals who seem disoriented;
- individuals showing signs of physical abuse;

---

[7] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .
[8] *See id.*

- individuals showing signs of restrain or confinement;
- individuals showing signs of malnourishment, poor hygiene, fatigue, or sleep deprivation;
- individuals with signs of untreated illness or injuries;
- individuals who appear to lack freedom of movement;
- individuals who are being constantly monitored and/or escorted around the hotel;
- individuals who avoid eye contact;
- individuals who avoid interactions with others;
- individuals who are not in possessions of their own identification;
- individuals who have few or no personal possessions;
- individuals who dress provocatively;
- a high volume of men who are not registered guests entering and exiting a room; and
- individuals who wait in common areas while other men frequent the room.

40.     Recognized "red flags" of sex trafficking that can be detected by front-desk staff and hotel security[9] include:

- patrons appeared distressed at check-in;
- the same person reserving multiple rooms;
- rooms paid for with cash or prepaid cards;
- rooms are paid for one day at a time;
- requests for isolated rooms or rooms close to an exit;
- use of hotel computers for adult oriented or sexually explicit websites;
- patrons not forthcoming about identifying information when registering;
- individuals checking in but then leaving a room only infrequently, not at all, or at odd hours;
- individuals lack identification;
- car in the parking lot is parked so license plate is not visible;
- individual present who avoids eye contact, does not communicate, and is accompanied by someone else who appears to speak for them; and

---

[9] *See id*.

- individual appears to be giving scripted responses.

41.    Recognized "red flags" of sex trafficking that can be detected by housekeeping, maintenance, and room service staff[10] include:

- constant use of the "Do Not Disturb" sign;
- requests for housekeeping services (towels, linens, etc.) but denying staff entry into the room;
- refusal of cleaning services for multiple days;
- excessive amounts of cash in a room;
- presence of multiple computers, cell phones, pagers, or other technology;
- the same person reserving multiple rooms;
- individuals leaving the room infrequently, not at all, or at unusual hours;
- individuals loitering in hallways or appearing to monitor a room;
- excessive alcohol in a room;
- illegal drugs in a room;
- evidence of pornography;
- excessive number of people staying in a room;
- guests with few or no personal possessions in room;
- provocative clothing and shoes;
- constant flow of men into a room at all hours; and
- excessive amounts of sex paraphernalia in rooms.

42.    The organizations who developed these "red flags," then educated and trained the hotel industry about them. For example, the United States Department of Homeland Security's Blue Campaign initiative issued specific guidance to the United States hotel industry through a "Hospitality Toolkit" describing human trafficking warning signs that could be detected by various categories of hotel staff. [11]

---

[10] *See id.*

[11] / Department of Homeland Security, Blue Campaign Toolkit, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.;

43.    Before A.G.B.'s trafficking period, each Defendant was educated and trained on these "red flags" of sex trafficking. The organizations that developed these "red flags" identified them as indicators specific to sex trafficking in a hotel environment. At all relevant times, each Defendant acknowledged and recognized these "red flags" specifically as signs of sex trafficking and instructed and trained their staff to treat them as signs of sex trafficking when observed in its hotel(s).

44.    It is, and has at all relevant times, been well established that signs of commercial sex in a hotel environment are "red flags" for the presence of sex trafficking.

45.    There is a well-known link between commercial sex in a hotel environment and sex trafficking. The United States Department of Justice and other agencies and organizations have recognized that most individuals involved in commercial sex are subject to force, fraud, or coercion.[12] As a result, these women are victims of sex trafficking. Most federal sex trafficking prosecutions involve individual traffickers acting as "pimps" who are operating without direction from or connection to a larger criminal network.[13] It is well known that the "traffickers in hotel/motel based commercial sex situations are often individual controllers, more commonly known as 'pimps.'"[14]

46.    State, local, federal, and international governments and law enforcement agencies have long recognized the link between commercial sex and sex trafficking. For example:

---

www.doj.state.wi.us/sites/default/files/ocvs/human%20trafficking/Hospitality%20Toolkit%20-%20English%20-%20Wisconsin%20AG%20Office%281%29.pdf

[12] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

[13] Human Trafficking Institute, 2020 Federal Human Trafficking Report 28 (2021), https://traffickinginstitute.org/wp-content/uploads/2022/01/2020-Federal-Human-Trafficking-Report-Low-Res.pdf.

[14] National Human Trafficking Hotline, *Hotel-Motel Based*, https://humantraffickinghotline.org/en/sex-trafficking-venuesindustries/hotelmotel.

13

- "The U.S. Government adopted a strong position against legalized prostitution in a December 2002 National Security Presidential Directive based on evidence that prostitution . . . . fuels trafficking in persons, a form of modern-day slavery."[15]

- In 2006 the United Nations Commission on Human Rights, Special Rapporteur or Trafficking in Persons recognized that "[f]or the most part, prostitution, as actually practiced in the world, usually does satisfy the elements of trafficking."[16]

- By 2008, a report of the Illinois Criminal Justice Information Authority concluded "young women in the sex trade who are controlled by a pimp should not be regarded as girls in prostitution, but as victims of violence who need assistance in safely exiting prostitution."[17]

- In 2010, the Anaheim Police Department (APD) recognized that a significant portion of those involved in prostitution who it came into contact with were likely trafficking victims and adopted a new approach that focused on rescuing women from their pimps and redirecting their lives.[18]

- In 2013, the New York State Court System launched the Human Trafficking Intervention Initiative recognizing that many individuals who end up in criminal courts are on prostitution charges "are recruited into the commercial sex industry by force, fraud, and/or coercion."[19]

47.    When governmental bodies, law enforcement agencies, non-profits, and hospitality-industry organizations developed the "red flags" of sex trafficking in a hotel, they recognized that signs of commercial sex are and should be treated as signs of sex trafficking. Based on the known link between commercial sex and trafficking and the patterns of sex trafficking in hotels, these entities recognized that certain signs associated with commercial sex are important indicators for the detection of sex trafficking in a hotel.

---

[15]United States Department of State, *The Link Between Prostitution and Sex Trafficking* https://2001-2009.state.gov/r/pa/ei/rls/38790

[16] U.N. Escor, Comm'n on Human Rights, *13 Integration of the Human Rights of Women and a Gender Perspective, Report of the Special Rapporteur on the Human Rights Aspects of the Victims of Trafficking in Persons, Especially Women and Children, ¶ 42 U.N. Doc. E/CN.4/2006/62 (Feb. 20, 2006) (Sigma Huda)

[17]https://humantraffickinghotline.org/sites/default/files/Domstic%20Sex%20Trafficking%20Chicago%20-%20ICJIA.pdf

[18] Steve Marcin, *Prostitution and Human Trafficking: A Paradigm Shift*, Law Enforcement Bulletin, https://leb.fbi.gov/articles/featured-articles/prostitution-and-human-trafficking-a-paradigm-shift#:~:text=After%20close%20analysis%20of%20prostitutes,tactic%20in%20addressing%20the%20problem.

[19] Center for State Court Innovation, *State Court Snapshot: New York State's Human Trafficking Intervention* Courts, https://cjinvolvedwomen.org/wp-content/uploads/2016/12/HTIC-1pager.pdf

48.     Defendants, as members of the hotel industry, were educated and trained on the link between commercial sex in a hotel and sex trafficking. Accordingly, as of the time of A.G.B.'s trafficking, each Defendant was on notice and recognized that signs of commercial sex in a hotel are and should be treated as signs of sex trafficking.

49.     Each Defendant knew that the link between commercial sex in a hotel environment and sex trafficking was sufficiently strong that ordinary prudence required treating signs of commercial sex activity as signs of sex trafficking. Under the circumstances, ordinary prudence further required each Defendant to avoid benefiting from rental of its rooms for commercial sex because doing so was associated with a strong probability that Defendants were thereby benefiting from the harboring of sex trafficking victims.

50.     Texas began reporting on the problem of human trafficking in the state by 2008. It was known that traffickers were targeting juvenile runaways.[20] And the role of gangs in facilitating sex trafficking was well known.[21]

51.     The most effective weapon against sexual exploitation and human trafficking is education and training.[22] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[23]

---

[20] Statement of the Director of the Texas Department of Public Safety, https://democrats-homeland.house.gov/imo/media/doc/20140320104640-70465.pdf

[21] *Id.*

[22] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

[23] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

15

52.    This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[24] In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

53.    Because of the prevalence of human trafficking in hotels and the established body of knowledge about how hotels can detect and respond to signs of sex trafficking, it has long been apparent that the decision of a hotel or hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and deter trafficking is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

54.    Defendants have made the choice to ignore their knowledge of sex trafficking in their hotels and instead to inadequately train, respond and enforce their own developed and adopted sex trafficking policies. Thus, they have chosen to continue to benefit from sex trafficking of victims like A.G.B.

III.    **A.G.B.'s Trafficking at the Esters Property-Ramada Inn.**

A. **Sex Trafficking at Wyndham Branded Hotels was well Known by the Wyndham Brand Defendants.**

55.    The Wyndham Brand Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. They have known, since well before A.G.B.'s trafficking at the Esters Property-Ramada Inn, that sex trafficking was ongoing and widespread at  Wyndham properties, including Ramada Inn hotels.

---

[24] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

56.    No later than 2007, activists were demanding that the Wyndham Brand Defendants act in response to child sex trafficking in their hotels.

57.    The problem of sex trafficking at Wyndham hotels was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotels from supporting child sex trafficking.

58.    In the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[25]

59.    Publicly available news reporting illustrates the entrenched and pervasive nature of sex trafficking at Wyndham-branded hotels and the Wyndham Brand Defendants' long-standing role in providing venues where such trafficking persisted unabated for years. The Wyndham Brand Defendants monitored news stories and online reviews for indicators of criminal activity, including sex trafficking, at their branded locations. Examples of news stories confirming the widespread presence of sex trafficking, prostitution, and related criminal activity at Wyndham hotels, including Ramada Inn properties, include:

- In June 1987 a federal grand jury indicted 16 persons on charges stemming from alleged participation in an interstate prostitution ring working out of hotels including a Rockville, Maryland Ramada Inn.[26]

- In September 2009, police discovered a prostitution ring at the Ramada Inn on Roosevelt Boulevard in Philadelphia.  Police looking for a defendant in a drug case discovered 11 women.  Some of the women reported that they were being held against their will and sexually assaulted.[27]

- In 2009, there was an arrest at a Ramada Inn in San Marcos, Texas related to trafficking of a minor.[28]

---

[25] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/
[26] Victoria Churchville, 16 INDICTED IN PROSITUTION RING THAT USED PAGERS, POSH HOTELS, The Washington Post, (June 19, 1987), https://www.washingtonpost.com/archive/local/1987/06/19/16-indicted-in-prostitution-ring-that-used-pagers-posh-hotels/c984c86e-6ecf-42ee-bb55-cbc980dab948/
[27] *Possible prostitution ring discovered at Boulevard Ramada*, WHYY PBS (Sept. 8, 2009), https://whyy.org/articles/possible-prostitution-ring-discovered-at-boulevard-ramada/
[28] https://www.sandiegouniontribune.com/sdut-1mc20prost182547-prostitutes-plying-trade-despite--2009jun20-story.html

- In February 2010, police in Burbank, California arrested three at the Ramada Burbank Airport Hotel on charges of prostitution as part of their effort to curb the sex trade.[29]

- In May 2010, a sting operation conducted by Waterloo, Iowa Police led to two arrests at the Ramada Inn.[30]

- In 2011, there was an arrest at a Ramada Inn in Suffolk County, Massachusetts involving trafficking of a minor.[31]

- In July 2012, East Hartford's "Hot Spot Unit" conducted a sting at at the Ramada Inn on Roberts Street in Hartford, Connecticut where it arrested a man for promoting prostitution and 6 women on charges of prostitution.[32]

- In January 2013 two women were arrested on suspicion of prostitution at the Ramada Inn Burbank in Burbank, CA.[33]

- In April 2013, police found an underage girl in a room where prostitution was believed to be occurring at a Tampa, Florida Ramada Inn. A twenty-five-year-old woman fled the scene. She was later arrested on charges of procuring a person under 18 for the purpose of prostitution, deriving support from the proceeds of prostitution and renting space to be used for prostitution.[34] She was later convicted of charges of trafficking three underage teens, including a 16-year-old girl and a 14-year-old boy.[35]

- In November 2013, an investigation into prostitution ring, led to the arrest of five people and the seizure electronic equipment at the Ramada Inn in La Vergne, Tennessee.[36]

---

[29] Olsen Ebright, Burbank Hookers, Beware, NBC 4 Los Angeles, (Mar. 3, 2010), https://www.nbclosangeles.com/news/local/burbank-prostitution/1867548/

[30] *Police make Prostitution Arrests*, Waterloo Police Department, https://www.waterloopolice.com/press-release/654-police-make-prostitution-arrests.html

[31] https://www.dotnews.com/2011/dorchester-man-charged-forcing-two-teens-prostitution/

[32] *East Hartford Police Arrest Seven on Prostitution Charges*, Harford Courant, (Jul. 26, 2012), https://www.courant.com/community/hartford/hc-xpm-2012-07-27-hc-east-hartford-prostitution-arrests-0728-20120727-story.html

[33] *Two women arrested on suspicion of prostitution at Burbank Ramada Inn*, Burbank Leader (Feb. 1, 2013), https://www.latimes.com/socal/burbank-leader/the818now/tn-818-0201-two-women-arrested-on-suspicion-of-prostitution-at-burbank-ramada-inn-story.html

[34] Kristin Weber, Woman accused of recruiting minor for prostitution, 10 Tampa Bay, (Apr. 2, 2013), https://www.wtsp.com/article/news/local/woman-accused-of-recruiting-minor-for-prostitution/67-326688993

[35] Dan Sullivan, Tampa woman gets 15 years in prison for recruiting teens for prostitution, Tampa Bay Times, (Nov. 11, 2016), https://www.tampabay.com/news/courts/criminal/tampa-woman-gets-15-years-in-prison-for-recruiting-teens-for-prostitution/2302520/

[36] Marie Kemph, Police: Drugs seized in prostitution ring raid, Murfreesboro Post, (Nov. 27, 2017), https://www.murfreesboropost.com/news/police-drugs-seized-in-prostitution-ring-raid/article_5ed959b6-fe72-52ee-bcc8-401c8f28d986.html

- In March 2014, undercover police raided a room at the Ramada Inn on Roosevelt Boulevard in Philadelphia arresting a woman for solicitation of prostitution and a man for suspected drug dealing.[37]

- In April 2014, police in Rock Hill, North Carolina, as part of a prostitution sting that netted five, made arrests at the Ramada Inn.  In total the arrests included three women and two men.[38]

- In June 2014, the mother of a mentally ill woman who police say was killed after meeting for sex at a Ramada Inn in College Park, Maryland said her daughter was mentally ill and was pimped by men via computer ads.[39]

- In September 2014, police in Parsippany, New Jersey – the same city Wyndham maintains its principal place of business - arrested a man and a woman in at a Ramada Inn only 12 minutes from Wyndham's corporate office on charges of theft and prostitution.[40]

- In March 2015, police arrested a woman who was renting a room at the Ramada Inn in Wayne, New Jersey for prostitution.[41]

- In April 2015, a woman was arrested on prostitution and drug charges by an undercover police officer in a sting at a Whitehall, Pennsylvania Ramada Inn.[42]

- In August 2015, at least 20 people were arrested in a prostitution sting conduced at a Des Moines, Iowa Ramada by Wyndham as part of an operation that began as a result of complaints from local business owners and citizens.[43]

- In December 2015 Hanover County, North Carolina District Attorney issued an admonishment to a Ramada Inn on Market Street, Wilmington, North Carolina, among others, for, "repeated acts which create and constitute a breach of the peace, including but not limited to prostitution, assaults, fights, and discharging firearms."[44]

---

[37] *Undercover cops make prostitution, drug arrests* Northeast Times (Mar. 20, 2014), https://northeasttimes.com/2014/03/20/undercover-cops-make-prostitution-drug-arrests/

[38] *Five arrested in prostitution sting at two Rock Hill motels, police say*, WBTV, (Apr. 24, 2014), https://www.wbtv.com/story/25330215/five-arrested-in-prostitution-sting-at-two-rock-hill-motels-police-say/

[39] Darcy Spencer, Mother of Motel Murder Victim: "She's Not a Prostitute," 4 Washington, (Jun. 8, 2014), https://www.nbcwashington.com/news/local/mother-of-motel-murder-victim-denies-daughter-was-a-prostitute/59771/

[40] William Westhoven, Stolen purse at Kmart leads to prostitution bust, Daily Record, (Sept. 7, 2014), https://www.dailyrecord.com/story/news/local/2014/09/07/stolen-purse-kmart-leads-prostitution-bust/15192421/

[41] Natalie Mieles, Prositution Arrest Made N Wayne Hotel, Patch, (Mar. 23, 2015), https://patch.com/new-jersey/wayne/prostitution-arrest-made-wayne-hotel-0

[42] Manuel Gamiz, Jr., Woman faces prosecution, drug charges after sting at Whitehall hotel, The Morning Call, (Apr. 23, 2015), https://www.mcall.com/news/breaking/mc-c-whitehall-hotel-prostitution-arrest-20150423-story.html

[43] Grant Rodgers and Kim Norvell, More arrests as prostitution stings continue, Des Moines Register, (Aug. 19, 2015), https://www.desmoinesregister.com/story/news/crime-and-courts/2015/08/19/urbandale-businessman-charged-prostitution/31987431/

[44] *DA, police chief focus on motel crime on Market Street*, Star News Online, (Jan. 10, 2016), https://www.starnewsonline.com/story/news/2016/01/10/da-police-chief-focus-on-motel-crime-on-market-street/30994128007/

- In February 2016, a Franklin, Tennessee Police Department used Backpage.com as part of a sting operation that lead to the arrest of a woman at the Ramada Inn on charges of prostitution, and possession of drug paraphernalia.[45]

60.     These articles are only limited representative examples. There are many similar articles about trafficking and other associated criminal activity at Wyndham branded hotels before, during, and after A.G.B.'s trafficking period. Moreover, on information and belief, the Wyndham Brand Defendants are aware of additional significant law enforcement activity related to trafficking at Wyndham hotels not reported in the media.

61.     Reviews of Ramada Inn hotels, which on information and belief, each of the Wyndham Brand Defendants, monitored regularly, also show both the pervasiveness of sex trafficking at Ramada Inn branded properties and the Wyndham Brand Defendants' notice regarding the same. For example:

- In December 2007 regarding the Ramada Inn in Toms River, New Jersey, in a review titled, "Hookers, Drugs, and poor service," a reviewer wrote "[a]s my wife and I went to our room, we were first asked for money from some guy in the hallway, then a prostitute informed us for a fee, she would join us…."[46]

- In February 2010 regarding the Ramada by Wyndham in Rochelle Park, New Jersey, a reviewer wrote, "[t]hin walls, so EVERYTHING was heard, especially when some pimp was yelling & cursing at his "employee" from 1am till 4 am. The clientele were mostly thugs & one-night-standers."[47]

- In September 2010 regarding the Ramada by Wyndham Pikesville/Baltimore North, a customer complained, "[a]nd to top it all off, we were awakened at 2 AM by a large party of about 25 young people outside the room, some of whom were apparently prostitutes--young girls in skimpy clothes talking to men through car windows."  The General Manager replied but did not address the prostitution complaint.[48]

- A November 2010 review regarding a Ramada in Seattle, Washington states "Basically if you like Prostitutes and Drug Dealers this is your place, The place is

---

[45] Zach Harmuth, Nolensville Woman Arrested in Prostitution Sting Awaits Court, Williamson Source, (Feb. 5, 2016), https://williamsonsource.com/nolensville-woman-arrested-prostition-sting-awaits-court/
[46] https://www.tripadvisor.co.uk/ShowUserReviews-g46870-d98468-r11235472-Ramada_by_Wyndham_Toms_River-Toms_River_New_Jersey.html
[47] https://www.tripadvisor.com/ShowUserReviews-g46782-d92577-r55266477-Ramada_by_Wyndham_Rochelle_Park_Near_Paramus-Rochelle_Park_New_Jersey.html
[48] https://www.tripadvisor.com/ShowUserReviews-g41317-d250631-r80299255-Ramada_by_Wyndham_Pikesville_Baltimore_North-Pikesville_Maryland.html

managed by a Very Young Arrogant Manager and his response to my complaints was everyone deserves a second chance, not to mention the noise."[49]

- A June 2011 review of a Ramada Inn in Costa Mesa, CA states "Wow this "hotel" is horrible…We were on the 3rd floor which was the quietest. Swore we saw 2-3 prostitutes walking around outside."[50]

- An October 2011 review of a Ramada in Bangor, ME states "About 1 in the morning there was a group of drunk people in the hallways running up and down the halls and slamming doors. I called the front desk and they said they would send someone up to check on it, however, the slamming continued for over an hour and a half. I also saw a man bringing a prostitute to his room down the hall where they had a "noisy" encounter."[51]

- A September 2011 review regarding a Ramada Inn in Reno, Nevada states "One word.. EEWWWWW! Hookers are outside courting truck drivers. Meth heads are going in and out the doors looking for thier next fix. Desk man wasnt anywhere to be found for check-in."[52]

- In October 2011 regarding the Ramada by Wyndham in East Orange, New Jersey, a reviewer wrote, "[w]as there any prostitution at the hotel?  Maybe.  But the pimps in the lobby always held the door for us…."[53]

- A May 2012 review of a Ramada in Denver, CO states "Definitely not safe as we witnessed actual drug deals and sex trade going on in back. The front desk staff was too busy flirting with each other to be helpful."[54]

- In June 2012 regarding the Ramada by Wyndham in East Orange, New Jersey, in a review titled, "It Is As Bad As They Say," a reviewer wrote, "[v]isible prostitutes going up and down the hall."[55]

- In September 2012 regarding the Ramada by Wyndham in Wyndham's home town of Parsippany, New Jersey, a reviewer advised, "[p]lease avoid this hotel at all costs unless you're a trucker or prostitute."[56]

[49] https://www.tripadvisor.com/Hotel_Review-g58732-d224851-Reviews-Ramada_by_Wyndham_SeaTac_Airport-SeaTac_Washington.html

[50] https://www.yelp.com/biz/ramada-by-wyndham-costa-mesa-newport-beach-costa-mesa

[51] https://www.tripadvisor.com/Hotel_Review-g40502-d93532-Reviews-Bangor_Grande_Hotel_Conference_Center-Bangor_Maine.html

[52] https://www.yelp.com/biz/ramada-by-wyndham-reno-hotel-and-casino-reno

[53] https://www.tripadvisor.com/ShowUserReviews-g46403-d92370-r119573653-Ramada_by_Wyndham_East_Orange-East_Orange_New_Jersey.html

[54] https://www.tripadvisor.com/Hotel_Review-g33388-d85325-Reviews-Ramada_by_Wyndham_Denver_Downtown-Denver_Colorado.html

[55] https://www.tripadvisor.com/ShowUserReviews-g46403-d92370-r132718173-Ramada_by_Wyndham_East_Orange-East_Orange_New_Jersey.html

[56] https://www.tripadvisor.com/ShowUserReviews-g46715-d98515-r141158336-Ramada_by_Wyndham_Parsippany-Parsippany_Morris_County_New_Jersey.html

- An October 2012 review of a Ramada Inn in Gainesville, FL states "Do NOT stay here. In disrepair, dirty, and a hub for drugs and prostitution. Hotels.com should not represent this hotel."[57]

- In November 2012 regarding the Ramada Limited in Cockeysville, Maryland, a reviewer wrote, "seems to be mainly a place for hooker hookups and not somewhere anyone actually stays."[58]

- A November 2012 review of a Ramada in Portland, Oregon states "First of all this place is disgusting. It is full of pimps and hoes and DRUGS :/."[59]

- In March 2013 regarding the Ramada by Wyndham Baltimore West in Baltimore, Maryland, a reviewer, in a review titled "Prostitute plaza," wrote, "[o]ur second evening we were confronted by ladies who were at the time selling themselves to us. As we walked to our car the next morning we were once confronted again by 2 different professional women advancing sexual and in appropriate verbiage to my 18 year old son."[60]

- A March 2013 review of a Ramada Inn in Bowling Green, Kentucky states "I noticed a woman wearing over the knee leather boots standing in front of the hotel, after I had checked in. She was obviously waiting to be "picked up"…If you are looking for hookers, this is the place to go!"[61]

- In August 2013 regarding Ramada by Wyndham West Atlantic City in Atlantic City, New Jersey, a reviewer reported, "a load of police cars because there was a prostitution raid…." The hotel's webmaster replied saying they appreciated the review and observations.[62]

- In September 2013 regarding the Ramada by Wyndham in Yonkers, New York, a reviewer complained, "[a]ll night…drugs and prostitution business is going on there with the knowledge of the staff and managers…."[63]

- In February 2014 regarding the Ramada by Wyndham in East Orange, New Jersey, a concerned citizen reported, "[t]here is also a revolving door of prostitution going on at the Ramada Inn" in East Orange, New Jersey on a message board.[64]

---

[57] https://www.expedia.com/Gainesville-Hotels-Motel-6-Gainesville.h918788.Hotel-Reviews
[58] https://www.tripadvisor.com/ShowUserReviews-g41075-d93714-r146214352-Ramada_Limited_Cockeysville-Cockeysville_Maryland.html
[59] https://www.tripadvisor.com/Hotel_Review-g52024-d96118-Reviews-Ramada_by_Wyndham_Portland_Airport-Portland_Oregon.html
[60] https://www.tripadvisor.co.nz/ShowUserReviews-g41045-d93846-r154472777-Ramada_by_Wyndham_Baltimore_West-Catonsville_Maryland.html
[61] https://www.tripadvisor.com/Hotel_Review-g39214-d92797-Reviews-Ramada_by_Wyndham-Bowling_Green_Kentucky.html
[62] https://www.tripadvisor.com/ShowUserReviews-g46742-d98115-r174159963-The_Ramada_Atlantic_City_West-Pleasantville_New_Jersey.html
[63] https://www.tripadvisor.com/ShowUserReviews-g48922-d93875-r175810200-Ramada_by_Wyndham_Yonkers-Yonkers_New_York.html
[64] https://seeclickfix.com/issues/928962-dangerous-elevator-ramada-inn

- A March 2014 review of a Ramada Inn in Reno, Nevada states "As I entered the hotel I immediately noticed the type of clients they have. I seriously think is like a pimp/prostitute warehouse."[65]

- An April 2014 of a Ramada in Alpharetta, GA states "The manager checked me in and on my way to the suit, two ladies drunk, smoking at the elevator, went into room and room was smelling old, a/c was not working effectively, no proper lighting in the room, after a while I went to sleep and some one came knocking on the door at abt 2 AM in the night, I was scared and looked through eye piece from the door, a man (supposedly a pimp) and a girl were just knocking all the doors to ask if anyone wants to have sex with that lady, I then called the desk and no one bothered to answer my cal...waited, calmly went back to bed! later, that morning, complained about the incident and the desk manager doesnt respond properly, poor communication..I wont recommend this to any one!!!"[66]

- In May 2014 regarding the Ramada by Wyndham Baltimore West, in Baltimore, Maryland a reviewer reported, "[a] big complaint was what appeared to be a prostitute going in and out of the room next to ours every 45 minutes or so and having relatively loud sex all night."[67]

- In November 2014 regarding the Ramada by Wyndham Waukegan/Great Lakes in Waukegan, Illinois, a reviewer noted, "I encountered the back door propped open on several occasions and different men pulling up in numerous vehicles, staying for a half hour or less each time. I called the front desk and reported this and was told the one man security would handle it. He didn't. Condoning prostitution is grounds for business license revocation or suspension."  Regarding prostitution, the Manager replied, "We never condone any illegal activities, have overnight security to assure the peace of all our guests, and cooperate fully with local law enforcement immediately should we encounter any illegal activities." [68]

- A June 2015 review of a Ramada Inn in Manchester, Tennessee states "The place looked pretty bad but when I went to the door of my room, I realized that there were pimps and their 'ladies' hanging out around the doorways. I went into my room and eventually pulled the bed cover back and got a big surprise. There was blood all over the sheets! Someone had bled on the bed and then pulled the sheet back over itâ€¦probably very soon before I checked into this hotel.  When I complained to the front desk clerk about it, she affected not to know what was going on and complained about my attitude. She didn't like it that I was mad about hookers bleeding all over the bed I was supposed to sleep in.  She said she had no idea that

[65] https://www.yelp.com/biz/ramada-by-wyndham-reno-hotel-and-casino-reno
[66] https://www.tripadvisor.com/Hotel_Review-g35235-d123989-Reviews-Ramada_by_Wyndham_Alpharetta-Roswell_Georgia.html
[67] https://www.tripadvisor.co.nz/Hotel_Review-g41045-d93846-Reviews-Ramada_by_Wyndham_Baltimore_West-Catonsville_Maryland.html
[68] https://www.tripadvisor.com/ShowUserReviews-g36854-d90331-r239174515-Ramada_by_Wyndham_Waukegan_Great_Lakes-Waukegan_Lake_County_Illinois.html

this was going on, that she was just the clerk wink, wink. Unless you are a customer for prostitutes, avoid this place like the plague."[69]

- In a July 2015 review of a Ramada by Wyndham in East Orange, New Jersey, a reviewer wrote, "[o]n the way back to our room, my husband heard a prostitute making "deals" with her clients. The foot traffic is heavy within this hotel, and now it makes sense. If you're looking for a prostitute, then this is the place to be, but this is not a family friendly hotel." The General Manager replied but did not address the concerns regarding prostitution.[70]

- In August 2015 regarding the Ramada by Wyndham Parsippany in Wyndham's home town of Parsippany, New Jersey, a reviewer titled their review, "Do NOT Feel SAFE Here Anymore-- has Become a HOTSPOT for Prostitution!!-," and wrote, "FIRST ALL DOORS Of the Hotel are "Open" to ANYONE walking from the Streets…Arriving back to my Room one evening at 1A, watching cars parking, then Various men Walking Right into the hotel. When I Went into End main door), I Was Absolutely Scared to Death Noticing a Man Crouched down Behind The STAIRS!!!! "Obviously Waiting His Turn" Hearing him Say "I am here". "I am Inside". The TRAFFIC Coming and Going Just that ONE NIGHT Was unbelieveablofe. It Became OBVIOUS That PROSTITUTION Had Become Quite POPULAR At This Hotel, It Was like a "Rats Nest", Men Walking in all hours, Men sitting in their Cars ALL HOURS. It Was a Very Shameful, and Disturbing Sight. I Did Not Feel SAFE I Did Not Feel Respected by the Hotel, I Was Very Saddened to See What has happened to this place!!!! I Actually Sat in my Car one evening at 11:30PM, literally Saw 7 Vehicles pull into parking lot, they would park, Men walking straight into the HOTEL!!! I Sat for about 20 minutes was All, Seeing All the Weird Men Coming and Going It was A Very CREEPY experience, it was Very Disturbing to me. You Don't have to be a Genius to See what is going on There…It is Hard to Believe that The Hotel is Allowing this type of Illegal Activity, These prostitutes are "Running Their Business" Selfish behavior and Non-Caring. The Hotel is CREEPY Now, ALL WEIRD MEN Coming and Going…The Ramada REPUTATION has certainly Changed for the WORSE. The Prostitution at the Hotel is Bringing WEIRD, CREEPY, LOW-CLASS people, If I WANTED A HOTEL With prostitution, With NO LOCKS on the Doors, With NO SECURITY, Random Men Hiding under stairway, Walking Around inside All hours, I Could get That in Newark. This Whole Place Has Become SHAMEFUL…I Don't Recommend it for Anyone, Unless you are a "JOHN" Wanting a Good Time!!!!"[71]

- In September 2015 regarding the Ramada by Wyndham Parsippany in Wyndham's home town of Parsippany, New Jersey, a reviewer titled their review, "ALL I SAW Was Hookers, (And to Make it More Interesting, TRANS-SEXUAL MEN Who WERE PROSTITUTES)," and wrote, "…the LOCKS ARE ALL BROKEN and ANYONE CAN JUST WALK INSIDE THE BUILDING, NO SECURITY, NO

---

[69] https://www.tripadvisor.com/Hotel_Review-g55181-d104564-Reviews-Quality_Inn-Manchester_Tennessee.html
[70] https://www.tripadvisor.com/ShowUserReviews-g46403-d92370-r294451091-Ramada_by_Wyndham_East_Orange-East_Orange_New_Jersey.html
[71] https://www.tripadvisor.com/ShowUserReviews-g46715-d98515-r302891589-Ramada_by_Wyndham_Parsippany-Parsippany_Morris_County_New_Jersey.html

LOCKS … I Think That 75% of the people Were prostitutes, and Everyone that I Saw parking and going inside Were Not GUESTS at the hotel, I Find it very Hard to believe That there is NO MANAGEMENT Seeing this activity…DRUGS, Hookers, It was AWFUL!!!!!"[72]

- In November 2015 regarding the Ramada Hotel & Conference Center by Wyndham in Edgewood, Maryland a reviewer titled their review, "Hookers bad WiFi and smelly room." The General Manager replied as to the other issues raised, but ignored the prostitution complaint.[73]

62.     These reviews are limited representative examples. There are many similar online reviews for Ramada Inn branded hotels, and, on information and belief, there are additional similar reviews and other customer complaints from before and during A.G.B.'s trafficking period that are not currently available on the internet but which the Wyndham Brand Defendants know about because they actively collected and monitored reviews for the Esters Property-Ramada Inn.

63.     Public statements confirm that the Wyndham Brand Defendants knew sex trafficking was a problem at Wyndham branded hotels and that they retained control over the response of Wyndham branded hotels to sex trafficking. Wyndham has recognized its "critical role in increasing awareness and prevention" of sex trafficking in their hotels.[74] The Wyndham brand has publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels since at least 2011.[75]

64.     Unfortunately, while the Wyndham Brand Defendants knew about the sex trafficking at their branded hotels, their public statements reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking and to stop receiving benefits from that trafficking. Wyndham has refused to publish reports to show its progress, or lack thereof,

---

[72] https://www.tripadvisor.com/ShowUserReviews-g46715-d98515-r313180289-Ramada_by_Wyndham_Parsippany-Parsippany_Morris_County_New_Jersey.html
[73] https://www.tripadvisor.com/ShowUserReviews-g41125-d89414-r325336267-Ramada_Hotel_Conference_Center_by_Wyndham_Edgewood-Edgewood_Maryland.html
[74] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[75] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/

on the ECPAT goals to combat sex trafficking in its hotels.[76] Emails among company executives of the Wyndham Brand Defendants reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[77] While the Wyndham Brand Defendants publicly committed to take steps to stop facilitating trafficking, this promise proved empty; the Wyndham brand has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[78]

65.    The Wyndham Brand Defendants were on notice of industry-recognized practices to avoid facilitating trafficking in hotels, but they continued operating in ways contrary to these practices.

66.    News stories, online reviews, guest complaints, public statements, and law enforcement efforts establish that, at the time A.G.B. was trafficked at the Esters Property-Ramada Inn, the Wyndham Brand Defendants knew or should have known:

   a.  The use of Wyndham branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

   b.  Commercial sex work occurring at Wyndham branded properties involved trafficking and compelled prostitution;

   c.  Wyndham franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at Wyndham hotel properties;

   d.  Their efforts, if any, to stop facilitating sex trafficking in Wyndham branded properties were not effective; and

---

[76] https://thecode.my.salesforce-sites.com/apex/MemberProfilenew?id=0019000000GxgPrAAJ&year=2023

[77] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")

[78] https://endsexualexploitation.org/wyndham/

     e. They were, by their acts and omissions, facilitating sex trafficking at Wyndham branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

67. The Wyndham Brand Defendants were informed of and knew of specific practices that would avoid facilitating sex trafficking in their hotels, but they elected to continue using contrary operational practices that facilitated sex trafficking.

68. Despite continually mounting evidence that sex trafficking at their branded properties was ongoing and growing, the Wyndham Brand Defendants did not alter course. They chose to continue earning revenue from renting their hotels for use as a venue for trafficking.

**B. The Wyndham Brand Defendants and Ramada Inn Franchisee had actual and constructive knowledge of widespread and ongoing sex trafficking at the Esters Property-Ramada Inn, including A.G.B.'s trafficking.**

69. At all relevant times, the Wyndham Brand Defendants and Ramada Inn Franchisee also knew or should have known that sex trafficking was prevalent at the Esters Property-Ramada Inn specifically because there was widespread sex trafficking on site that followed well-established patterns and presented with obvious signs that the Wyndham Brand Defendants and Ramada Inn Franchisee knew and acknowledged to be indicators of sex trafficking in a hotel environment.

70. The Wyndham Brand Defendants and Ramada Inn Franchisee should have known that the Esters Property-Ramada Inn was in a high crime area with a heightened risk for sex trafficking.

71. A.G.B. was aware that other victims were being trafficked at the Esters Property-Ramada Inn, including by her own traffickers, and there were obvious signs of this activity consistent with industry-recognized "red flags" of trafficking.

72. Between 2012 and 2013, A.G.B.'s traffickers brought her to the Esters Property-Ramada Inn repeatedly and regularly, typically staying for a week or two at a time and trafficking her there as a minor.

73.    During these stays, A.G.B. and her traffickers would interact with and be observed by members of the hotel staff, including the front desk staff and housekeeping staff. A.G.B. recalls that they would encounter the same staff members repeatedly. It was obvious to A.G.B. based on these repeated interactions that staff began to recognize her.

74.    During the period that A.G.B. was trafficked at the Esters Property-Ramada Inn, there were obvious signs associated with her trafficking:

- The hotel rooms where she was trafficked were frequently paid for with cash.

- Although they would stay for a week or two at a time, A.G.B.'s trafficker would pay for the room daily, reupping the room using cash earned the previous day.

- A.G.B. was repeatedly trafficked at this hotel as a minor, starting when she was only 15, and she looked consistent with young age.

- A.G.B.'s trafficker required her to dress provocatively in clothing inappropriate for her age.

- A.G.B. would remain at Esters Property-Ramada Inn for a week or two at a time, including on school days when it was obvious she should have been in school.

- A.G.B. was trafficked at his hotel often enough that staff began to recognize her on arrival.

- A.G.B. would show obvious signs of fatigue and sleep deprivation and would have a nervous demeanor.

- A.G.B.'s trafficker often trafficked another victim alongside A.G.B. at this hotel at the same time.

- Hotel staff would observe A.G.B., a minor, in the presence of her trafficker, a much older bearded man who dressed in a flashy manner and carried a gun, which was usually visible.

- A.G.B.'s trafficker drove noticeably flashy cars to the Esters Property-Ramada Inn.

- A.G.B.'s trafficker would often rent two rooms at the same time.

- There were observable signs of drug use in the room where A.G.B. was trafficked, including use of marijuana.

- A.G.B. was frequently under the influence of drugs while at the Esters Property-Ramada Inn.

28

- Extra towels were requested frequently.

- When hotel staff did enter A.G.B.'s room, they would observe excessive amounts of sex paraphernalia like condom wrappers and lubricant.

- A.G.B. was required to see an average of 8 to 10 johns each day when she was trafficked at the Esters Property-Ramada Inn, and sometimes as many as 15 in a single day.

- There was heavy foot traffic in and out of A.G.B.'s room involving men who were not hotel guests. This traffic was visible to hotel staff. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

- A.G.B.'s trafficker would sometimes require her to go to meet johns and escort them to her room.

- A.G.B.'s trafficker would be on site at the Esters Property-Ramada Inn to monitor her. She would have to walk her earnings to him in between seeing johns.

- Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

75.    Multiple employees at the Esters Property-Ramada Inn, including management-level employees, observed or were made aware of these obvious signs of A.G.B.'s trafficking while acting within the scope and course of their employment.

76.    All knowledge from the staff and management at the Esters Property-Ramada Inn is imputed to Ramada Inn Franchisee who, therefore, knew about or was willfully blind to the trafficking at the Esters Property-Ramada Inn. This knowledge is also imputed to the Wyndham Brand Defendants based on the existence of an agency relationship as alleged below.

77.    Ramada Inn Franchisee also had notice of the sex trafficking at the Esters Property-Ramada Inn based on its:

a.    surveillance of the property;

b.    internal investigations;

c.    customer complaints and monitoring of guest feedback feedback;

29

   d. information received from law enforcement;

   e. and other sources of non-public information available to Ramada Inn Franchisee.

78. Ramada Inn Franchisee also had constructive knowledge of the activity that resulted in the trafficking of A.G.B. at the Esters Property-Ramada Inn because that activity was accompanied by sufficiently numerous and obvious recognized "red flags" of sex trafficking that it was readily detectable through the exercise of ordinary diligence. If Ramada Inn Franchisee had exercised reasonable prudence in operating the Esters Property-Ramada, it would not have benefited from the illegal activities of A.G.B.'s traffickers at this hotel.

79. The Wyndham Brand Defendants also knew or should have known about the trafficking at the Esters Property-Ramada Inn based on:

   a. the obligation of hotel staff and Ramada Inn Franchisee to report suspected criminal activity;

   b. the Wyndham Brand Defendants' regular monitoring of online reviews;

   c. the Wyndham Brand Defendants' collection and monitoring of customer surveys and complaints;

   d. the Wyndham Brand Defendants' requirement that Ramada Inn Franchisee submit regular and detailed reports to the Wyndham Brand Defendants about day-to-day hotel operations;

   e. the Wyndham Brand Defendants' collection and monitoring of data about guests at the Esters Property-Ramada Inn, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

   f. the Wyndham Brand Defendants' supervision and control over day-to-day operations of the Esters Property-Ramada Inn through detailed information and extensive reports that it obtained through the property management system and other software systems it required franchisee to use and through which franchisee was obligated to allow the Wyndham Brand Defendants to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

   g. the Wyndham Brand Defendants' employment of field-based personnel to work with hotels on operational issues, including those related to detection and deterrence of sex trafficking;

30

**h.** the Wyndham Brand Defendants' unlimited right to inspect the Esters Property-Ramada Inn;

**i.** information provided to the Wyndham Brand Defendants by law enforcement; and

**j.** other sources of information that were available to the Wyndham Brand Defendants.

80.   On information and belief, the Wyndham Brand Defendants were on notice of obvious "red flags" of numerous instances of sex trafficking occurring at the Esters Property-Ramada Inn based on their supervision and monitoring of the property. As a result, the Wyndham Brand Defendants knew or should have known that the Esters Property-Ramada Inn was facilitating sex trafficking.

81.   The Wyndham Brand Defendants had constructive knowledge of A.G.B.'s trafficking at the Esters Property–Ramada Inn because the activity there was accompanied by numerous and obvious, industry-recognized red flags of sex trafficking, which any hotel exercising ordinary diligence would have detected and acted upon. Had the Wyndham Brand Defendants exercised ordinary prudence in the areas of hotel operations they controlled or in which they directly participated, they would not have benefited from the illegal activities of A.G.B.'s traffickers at the Esters Property–Ramada Inn.

**C. Ramada Inn Franchisee facilitated the trafficking activity at the Esters Property-Ramada Inn, including the trafficking of A.G.B.**

82.   Ramada Inn Franchisee participated in the harboring of A.G.B. and other victims at the Esters Property-Ramada Inn by continuing to provide rooms in which these victims were held, maintained, provided, despite at least willful blindness to the fact that sex trafficking was occurring at the Esters Property-Ramada Inn.

83. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Esters Property–Ramada Inn, Ramada Inn Franchisee continued renting rooms for use in trafficking, providing traffickers with a safe haven and operating the hotel in ways that enabled and facilitated sex trafficking activity.

84. Although Ramada Inn Franchisee at least should have known of the activity that resulted in A.G.B.'s trafficking, it continued to rent rooms used for that trafficking.

85. Ramada Inn Franchisee further facilitated the trafficking of A.G.B. and other victims at the Esters Property–Ramada Inn by:

   a. developing familiar relationships with A.G.B.'s traffickers, and creating an understanding that these traffickers could operate at the hotel without risk of interference;

   b. continuing to provide rooms, services, and assistance despite clear red flags of trafficking;

   c. observing A.G.B. in visible distress yet continuing to rent rooms used to traffic her;

   d. allowing a high volume of sex buyers, who were not registered hotel guests, to freely access the hotel without requiring identification or taking any other steps to log or track these unregistered visitors;

   e. supplying excessive quantities of towels and linens to accommodate the high volume of commercial sex occurring on site;

   f. employing inadequate practices for hiring, training, supervising, and disciplining staff on issues related to the detection of and response to signs of sex trafficking and related criminal activity;

   g. using inappropriate and inadequate policies and protocols for detecting, documenting, and escalating signs of sex trafficking;

   h. following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

   i. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff; and

32

    **j.**  providing these traffickers with the cover of a legitimate business where they could operate without having to divert significant time and resources to avoid detection or interference by hotel staff.

86.    Ramada Inn Franchisee's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including A.G.B.

87.    Ramada Inn Franchisee knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**D.  The Wyndham Brand Defendants facilitated the trafficking activity at the Esters Property-Ramada Inn, including the trafficking of A.G.B.**

88.    The Wyndham Brand Defendants participated directly in aspects of the operation of the Esters Property-Ramada Inn that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of A.G.B., as follows:

    **a.**  adopting a brand-wide response to sex trafficking, partnering with anti-trafficking organizations on behalf of Wyndham branded hotels, and assuming joint responsibility with the franchisee for detecting and preventing sex trafficking at the hotel property;

    **b.**  assuming or retaining control over communication with franchisee and hotel staff regarding sex trafficking awareness and practices to avoid facilitating sex trafficking;

    **c.**  assuming or retaining control over and responsibility for training hotel staff on detecting and responding to sex trafficking based on the well understood "red flags" or signs of sex trafficking;

    **d.**  assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to sex trafficking;

    **e.**  requiring franchisees to provide Wi-Fi/internet access to guests;

f. mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests and setting related policies and protocols;

g. setting policies on guest identification and logging requirements;

h. setting policies on payment methods franchisees were required to accept, including cash;

i. setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

j. requiring franchisees to use a system to monitor and track housekeeping requests;

k. setting policies for when and how housekeeping services are provided and for entry into guest rooms; and

l. collecting and monitoring data that shows patterns of use or non-use of housekeeping services.

89. Wyndham Brand Defendants played a central role in renting rooms at the Esters Property-Ramada Inn including by, among other things:

a. controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for guest reservation, check-in, and payment processes;

b. controlling, overseeing and enforcing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification.

c. requiring the franchisee to use the franchisor's centralized reservation system and preventing the franchisee from using any other system;

d. reserving rooms and accepting payments without requiring franchisee intervention;

e. controlling and restricting the ability of franchisee and staff to refuse or cancel a reservation.

f. requiring the franchisee to use a software system operated and controlled by the franchisor for booking rooms and checking guests into rooms;

g. requiring the franchisee to use a software system operated and controlled by the franchisor to process payments;

h. requiring the franchisee to use a property-management system operated and controlled by the franchisor;

i. requiring the franchisee to use a data-management system operated and controlled by the franchisor;

j. ensuring that data related to each room reservation passes through systems owned, maintained, and managed by the franchisor;

k. exercising control over the price of rooms;

l. controlling all details of the customer loyalty program that the franchisee was required to implement;

m. setting detailed policies for the check-in process, including requirements for identification and payment methods;

n. collecting guest data, requiring franchisees to report guest data, and reviewing and analyzing guest data, including names, payment information, reservation history, internet browsing data, and other details associated with their stay; and

o. assuming ownership over all guest and property information.

90. Despite having actual or constructive knowledge of sex trafficking at the Esters Property–Ramada Inn, the Wyndham Brand Defendants continued renting rooms to traffickers, including the very rooms used to sexually exploit A.G.B.

91. On information and belief, despite actual or constructive knowledge of sex trafficking at the Esters Property–Ramada Inn, including the activity that resulted in A.G.B.'s trafficking, the Wyndham Brand Defendants used their retained control over and direct involvement in hotel operations to facilitate trafficking by:

a. adopting, maintaining, and enforcing guest-identification policies that allowed traffickers, including A.G.B.'s traffickers, to rent rooms without providing their true identifying information or identifying all occupants;

b. adopting, maintaining, and enforcing payment-method policies that enabled traffickers, including A.G.B.'s traffickers, to pay for rooms using their preferred, non-traceable methods;

35

c.  adopting, maintaining, and implementing policies that permitted high volumes of unregistered male visitors to freely access the hotel and its rooms without screening or logging;

d.  retaining and exercising control over training but failing to provide adequate training to Ramada Inn Franchisee and hotel staff on how to detect and respond to sex trafficking;

e.  maintaining inadequate policies and protocols for detecting, documenting, and responding to trafficking activity;

f.  adopting and enforcing policies regarding housekeeping services and room entry that facilitated use of rooms for sex trafficking;

g.  exercising its control over guest internet access in a manner that allowed guests to use the hotel internet to facilitate advertisement of commercial sex online; and

h.  implicitly or explicitly encouraging Ramada Inn Franchisee to continue employing the same operational methods despite clear evidence that those methods enabled and perpetuated sex trafficking at Wyndham hotels around the country.

92.     A.G.B.'s traffickers were able to operate without interference and without making significant effort at a concealment during repeated visits to the Esters Property-Ramada Inn over an extended period because the Wyndham Brand Defendants adopted, implemented, enforced, and used policies and practices that facilitated sex trafficking and minimized the risk of detection and traceability.

93.     The Wyndham Brand Defendants' acts and omissions, which result from a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including A.G.B.

94.     The Wyndham Brand Defendants knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

36

### E.  Defendants' Ventures at the Esters Property-Ramada Inn

95.    Ramada Inn Franchisee and the Wyndham Brand Defendants each benefited from the use of the Esters Property–Ramada Inn for sex trafficking. A.G.B.'s traffickers and other traffickers repeatedly rented rooms at the property and used them to harbor, maintain, and exploit victims, including A.G.B. Each time traffickers rented rooms, both Ramada Inn Franchisee and the Wyndham Brand Defendants received benefits:

a.  Ramada Inn Franchisee generated revenue every time a sex trafficker rented a room at the Esters Property-Ramada Inn, both from room rental fees and from fees for other hotel services;

b.  Each of the Wyndham Brand Defendants also derived substantial income from operations at the Esters Property–Ramada Inn. In exchange for their role in hotel operations as described above, they received a percentage of the hotel's gross room revenues. Because their fees were based on gross room rentals, the Wyndham Brand Defendants' income increased with each rental—including those used for trafficking. On information and belief, revenue derived from the Esters Property–Ramada Inn was distributed among the Wyndham Brand Defendants, with each benefiting from every room rental; and

c.  The Wyndham Brand Defendants further benefited from traffickers' frequent and regular use of the hotel, which increased occupancy rates and, in turn, enhanced the brand's financial position by improving its ability to obtain financing and market additional franchise opportunities.

96.    In ways more fully described above, the Wyndham Brand Defendants and Ramada Inn Franchisee knowingly benefited from participating in a venture with traffickers who regularly operated at the Esters Property-Ramada Inn, including A.G.B.'s traffickers ("Venture 1").

97.    Both the Wyndham Brand Defendants and Ramada Inn Franchisee participated in this venture through their respective roles in the business relationship that formed between the Esters Property-Ramada Inn and these traffickers. This business relationship involved mutual pursuit of benefit: Defendants earned revenue and other benefits from room rentals, while traffickers used those rooms to generate income from commercial sex. This business relationship developed as follows:

a. A.G.B.'s trafficker operated out of hotels, such that a hotel venue where he could harbor, maintain, and provide A.G.B. and other victims was a crucial component of his business model.

b. Ramada Inn Franchisee and the Wyndham Brand Defendants facilitated and enabled sex trafficking at the Esters Property-Ramada Inn in the ways described above.

c. A.G.B.'s trafficker came to understand that policies and practices at the Esters Property-Ramada Inn would minimize the risk of detection and traceability, facilitating their operations.

d. A.G.B.'s trafficker developed an understanding that hotel staff would turn a blind eye and thus were able to operate without diverting time and resources to avoiding inference by hotel staff.

e. A.G.B.'s trafficker repeatedly returned to this same hotel and was able to attract business due to the low-risk environments for sex buyers.

98. Ramada Inn Franchisee participated in this continuous business relationship through its "boots-on-the-ground" control over daily operations at the Esters Property–Ramada Inn. The Wyndham Brand Defendants participated through their centralized control of reservations and their direct role in policies and training related to detecting and responding to sex trafficking as further described above.

99. This continuous business relationship facilitated, assisted, and supported traffickers' illegal operations, including their trafficking of A.G.B. Together, the Wyndham Brand Defendants and Ramada Inn Franchisee not only provided traffickers with a physical venue but also the cover of a legitimate business, enabling them to profit from sexual exploitation without meaningful risk of detection. Defendants also allowed unregistered male sex buyers to enter and exit freely without identification, helping traffickers attract customers and minimize law-enforcement exposure. The conduct of both the Wyndham Brand Defendants and Ramada Inn Franchisee thus facilitated trafficking at the Esters Property–Ramada Inn.

100.    In ways described more fully above, the Wyndham Brand Defendant and Ramada Inn Franchisee also knowingly benefited from participating together in a hotel-operating venture at the Esters Property-Ramada Inn that facilitated ongoing sex trafficking, including the trafficking of A.G.B. (hereinafter "Venture 2").

101.    Venture 2 is a commercial hotel-operating venture that resulted from a longstanding business relationship between Ramada Inn Franchisee and the Wyndham Brand Defendants that centered on operation of the Esters Property-Ramada Inn. This undertaking involved shared goals of maximizing gross room revenue and increasing room occupancy rates.

102.    Ramada Inn Franchisee Franchise and the Wyndham Brand Defendants each participated in this commercial undertaking through their respective roles in hotel operations as further described above. Each of these Defendants was directly involved in aspects of operations that facilitated sex trafficking at the hotel and continued to operate the hotel in the same manner despite actual or constructive knowledge that this was facilitating sex trafficking.

103.    There were TVPRA violations within the scope of Venture 2 because the hotel at the center of the venture, the Esters Property-Ramada Inn, was used to harbor, maintain, provide, and exploit many trafficking victims, including multiple victims of A.G.B.'s traffickers and A.G.B. herself. There were also TVPRA violations with the scope of Venture 2 through Ramada Inn Franchisee's violations of 18 U.S.C. §1591(a) as a perpetrator.

**F. Ramada Inn Franchisee and the Staff at the Esters Property-Ramada Inn Acted as Actual Agents of the Wyndham Brand Defendants.**

104.    The Wyndham Brand Defendants are vicariously liable for the acts, omissions, and knowledge of Ramada Inn Franchisee and hotel staff, which acted as the Wyndham Brand Defendants' actual agents or subagents when operating the Esters Property-Ramada Inn.

39

105.    The Wyndham Brand Defendants subjected and retained the right to subject Ramada Inn Franchisee to detailed requirements regarding the operation of the Esters Property-Ramada Inn. These detailed requirements came from written agreements, manuals, policies, protocols, directives, and mandates that the Wyndham Brand Defendants imposed through retained and ongoing control of hotel operations.

106.    The Wyndham Brand Defendants obscure the full extent of control exercised over Ramada Inn Franchisee by treating relevant manual, policies, and directives as confidential and proprietary and guarding against public disclosure. On information and belief, the requirements that the Wyndham Brand Defendants imposed on Ramada Inn Franchisee:

   a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Ramada Inn Franchisee used at the Esters Property-Ramada Inn, such as telling hotel staff step-by-step how to perform tasks at the hotel and mandating that Ramada Inn Franchisee use tools and products selected and controlled by the Wyndham Brand Defendants;

   b. covered virtually all aspects of hotel operations, including internal operating functions, such as human-resources issues and accounting and finance practices.

   c. dictated the specific ways that Ramada Inn Franchisee and hotel staff were required to carry out day-to-day functions.

   d. required the use of Wyndham Brand Defendants' owned, operated and controlled reservation and operation systems software and hardware; and

   e. significantly exceeded what was necessary for the Wyndham Brand Defendants to protect their trademarks.

107.    In addition to the ways described above, the Wyndham Brand Defendants, on information and belief,  exercised and reserved the right to exercise systemic and pervasive control over Ramada Inn Franchisee's day-to-day operation of the Esters Property-Ramada Inn, including in the following ways:

   a. requiring Ramada Inn Franchisee and hotel management to participate in mandatory training programs, both during onboarding and on an ongoing basis.

This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for Wyndham to protect its registered trademarks;

b.  providing training for hotel management and select hotel staff on-site and at locations selected by Wyndham;

c.  providing hotels staff with Wyndham created training through an online learning platform they controlled and maintained, including training specific to hotel-based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

d.  controlling training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e.  retaining sole discretion to determine whether all training had been completed satisfactorily;

f.  retaining control through a requirement that Wyndham certify and periodically recertify management at the Esters Property-Ramada Inn;

g.  requiring Ramada Inn Franchisee to participate in mandatory centralized services for day-to-day operation of the hotel;

h.  designating approved vendors and prohibiting Ramada Inn Franchisee from purchasing certain goods and services to be used for hotel operations from anyone other than an approved vendor;

i.  requiring franchisees to use its revenue management system, through which it dictated pricing and strategies to maximize revenue, and which gave it direct ability to supervise day-to-day operations of the hotel through direct access to the system;

j.  controlling room rates and discounts;

k.  establishing certain requirements for staffing at the Esters Property-Ramada Inn;

l.  establishing detailed policies that referenced specific job titles and dictated which positions must perform which tasks and how they must do so;

m.  controlling channels for guests to report complaints or provide feedback regarding the Esters Property-Ramada Inn and directly participating in the response and/or supervising and the response to customer complaints or other feedback.

n.  generating reports and analysis of guest complaints and online reviews for the Esters Property-Ramada Inn;

41

**o.** setting detailed requirements for insurance that Ramada Inn Franchisee must purchase;

**p.** exercising or retaining control over Ramada Inn Franchisee's day-to-day accounting and banking practices;

**q.** regularly auditing the books and records of Ramada Inn Franchisee;

**r.** retaining the right to conduct unlimited inspections of the Esters Property-Ramada Inn;

**s.** retaining the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if Ramada Inn Franchisee violated any of Wyndham' detailed rules, expectations, protocols, or policies;

**t.** controlling all marketing for the Esters Property-Ramada Inn, directly providing marketing services, and prohibiting Ramada Inn Franchisee from maintaining any online presence unless specifically reviewed and approved by Wyndham;

**u.** exercising or retaining control over building and facility design, including aspects that directly impacted safety and security;

**v.** imposing detailed recordkeeping and reporting requirements on Ramada Inn Franchisee regarding virtually all aspects of hotel operations;

**w.** supervising and controlling day-to-day operations of the Esters Property-Ramada Inn through detailed information and extensive reports that it obtained through the property management system and other software systems it required Ramada Inn Franchisee to use; and

**x.** retaining the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

108. As further described above, the Wyndham Brand Defendants specifically retained and exercised control over the aspects of hotel operations at the Esters Property-Ramada Inn that caused or contributed to A.G.B.'s harm, including but not limited to: reservations of rooms, relevant policies (including payment method accepted, identification requirements, and hotel access for individuals who are not registered hotel guests), training of management and employees, and development of a brand-wide response to sex trafficking. The Wyndham Brand Defendants

had the right to exercise detailed, day-to-day control over and involvement in these areas. They also regularly and closely monitored these areas.

**G. The Wyndham Brand Defendants are jointly responsible for the trafficking of A.G.B. at the Esters Property-Ramada Inn.**

109.    On information and belief, the rights and obligations regarding the operation, franchising, and control of the Esters Property-Ramada Inn were shared and fulfilled jointly by the Wyndham Brand Defendants and/or their predecessors for which they are liable.

110.    On information and belief, each of the Wyndham Brand Defendants shared revenue related to operation, franchising, and control of the Esters Property-Ramada Inn, and each of the Wyndham Brand Defendants experienced a direct benefit from the rental of rooms to traffickers at the Esters Property-Ramada Inn.

111.    On information and belief, each of the Wyndham Brand Defendants were corporate affiliates subject to common ownership and control.

112.    On information and belief, each of the Wyndham Brand Defendants shared office space, officers and directors, employees, management,  tools, information systems, and policies.

113.    On information and belief, operation of the Esters Property-Ramada Inn was part of a single unified operation by Wyndham Brand Defendants

114.    On information and belief, each of the Wyndham Brand Defendants or their predecessor entities for which they are liable jointly fulfilled obligations under the franchising agreement with Ramada Inn Franchisee and acted together to provide operational services and oversight at the Esters Property-Ramada Inn.

IV.    **A.G.B.'s Trafficking at the Esters Property-Quality Inn.**

**A. Sex Trafficking at Choice Hotels was well Known by Choice.**

115.    Choice's actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Choice has known, since well before A.G.B.'s trafficking, that sex trafficking was ongoing and widespread at Choice properties.

116.    On information and belief, Choice monitored criminal activity occurring at its branded hotels and was aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the Esters Property-Quality Inn. Information that has become public through news stories establishes the entrenched and pervasive nature of the Choice's role in providing a venue where sex trafficking has continued unabated for years. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Choice hotels and Choice's notice of the same:

- In August 2013, a man was charged with human trafficking after he held a 15-year-old girl against her will at a Quality Inn in Alabama where she was beaten, forced to do drugs, and sold for sex.[79] The man was sentenced to fifty years for human trafficking.[80] A civil lawsuit was later filed against this Quality Inn.[81]

- In August 2013, two people were charged with sex trafficking of children by force or coercion after they recruited and harbored a 16-year-old girl and kidnapped a 19-year-old girl for prostitution at a Quality Inn in South Carolina.[82]

- In April 2014 a man was arrested for human trafficking young women at a Quality Inn in Florida.[83]

- In May 2014 a man was sentenced to 12 years in prison for sex trafficking a child after being arrested at a Quality Inn in Pennsylvania when he was accompanying a minor to a date.[84]

---

[79] https://www.wsfa.com/story/23118431/shock-after-man-charged-with-human-trafficking-of-girl-in-dothan/
[80] https://www.al.com/news/montgomery/2014/06/houston_county_judge_sentences.html
[81] https://www.al.com/news/birmingham/2017/01/sex_trafficking_survivor_files.html
[82] https://www.wistv.com/story/23048777/two-accused-of-sex-trafficking-children-denied-bond/
[83] https://archive.tcpalm.com/news/vero-beach-man-charged-with-human-trafficking--video-ep-456198732-341865991.html/
[84] https://www.fbi.gov/contact-us/field-offices/pittsburgh/news/press-releases/pittsburgh-man-sentenced-to-12-years-in-prison-for-sex-trafficking-of-a-child

- In February 2015 a 17-year-old girl was being used as a prostitute at a Quality Inn in Massachusetts before police were able to arrest her pimp and return her to state custody.[85]

- In May 2015 two teenagers were rescued at a Quality Inn in Alabama and a man was arrested for human trafficking.[86]

- In September 2015 a man was convicted and sentenced to one year and six months in state prison for attempting to pimp a woman at a Quality Inn in California.[87]

- In October 2015 a man and woman faced felony charges after they coerced a 15-year-old girl into prostitution and held her at a Quality Inn in North Carolina.[88]

- In June 2016 three people were charged with patronizing prostitution following a sting which was conducted at a Quality Inn in Connecticut.[89]

- In September 2016 three people in Kentucky, including a police sergeant, were arrested in connection to a prostitution investigation that began when authorities received a complaint of a female being held against her will at the Quality Inn.[90]

- In January 2017 two men pleaded guilty to human trafficking after running a prostitution ring out of a Quality Inn in Mississippi.[91]

- In May 2017 a man was accused of human trafficking after running the operation out of a room at a Quality Inn in Florida.[92]

117.   These articles are only limited representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Choice branded hotels. Moreover, on information and belief, Chois is aware of additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media.

---

[85] https://www.enterprisenews.com/story/news/2015/02/12/police-arrest-alleged-pimp-in/35171802007/
[86] https://www.al.com/news/montgomery/2015/05/2_teenagers_recovered_south_ca.html
[87] https://orangecountyda.org/press/man-sentenced-to-prison-for-attempted-pimping-of-woman-after-having-her-meet-with-an-undercover-officer-whom-he-thought-was-sex/
[88] https://www.wsoctv.com/news/local/two-accused-coercing-teen-prostitution/27246974/
[89] https://patch.com/connecticut/newhaven/new-haven-men-arrested-prostitution-sting-operation-stratford
[90] https://clarksvillenow.com/local/oak-grove-police-sergeant-2-others-arrested-during-prostitution-investigation/
[91] https://www.wjtv.com/news/2-men-plead-guilty-in-human-trafficking-case/
[92] https://www.jacksonville.com/story/news/crime/2017/05/31/jacksonville-man-43-arrested-human-trafficking-charges/15757285007/

118.    Reviews of Choice branded properties, which on information and belief Choice monitored regularly, also show both the pervasiveness of sex trafficking at Choice branded properties and Choice's notice of the same. For example:

- A January 2006 review of a Quality Inn in Orlando, FL states "Dirty, worn carpets with lumps underneath, no blankets on bed, "clean" towels with hair on them, cigarette stains on tubs, roaches in bathroom, stale smoke smell, no tissues, sink knob broken, security locks on doors broken off, poorly repaired hole in bathroom wall, bathroom door dragged on floor and would not shut all the way, hookers in the parking lot approaching members of our group. When i complained, especially about the hookers, I was told there wasn't much they could do and they would "pass on the complaints to the management."[93]

- A July 2006 review of a Quality Inn in Oakland, CA states "we checked into room 219 (in the back of the motel) only to find numerous prostitutes and apparent pimps in the parking lot and some of the first floor rooms. I felt it was a very very unsafe environment and we moved to another motel after only one half hour in the room."[94]

- An August 2009 review of a Quality Inn in Port Allen, LA states "Oh, yea. I was outside having a smoke aboug midnight when two prostitutes began knocking two doors down from us. It seems no one there wanted company, so they began hitting on me until they learned I was with my family."[95]

- A February 2010 review of a Quality Inn in New Orleans, LA states "We checked in late at night following a long drive, not knowing that this hotel was in a seedy part of New Orleans. The parking lot was full of loiterers. There were obvious prostitutes in the lobby, and someone had recently vomited on the elevator. Only one of the lights in the bedroom worked - and there was no door knob on the bathrrom door. There were screams in the hallway during the night.  This hotel is unsafe and not clean."[96]

- An August 2010 review of a Quality Inn in Toledo, OH states "Two 19 year olds were shot in the middle of the night at the convenience store next door and a hooker was sitting on the curb out front of the hotel waiting for "a ride" when we left. This place was a real bummer."[97]

---

[93] https://www.tripadvisor.com/Hotel_Review-g34515-d17803954-Reviews-Quality_Inn_Suites_Downtown-Orlando_Florida.html
[94] https://www.tripadvisor.com/Hotel_Review-g32810-d80444-Reviews-Quality_Inn_Oakland-Oakland_California.html
[95] https://www.tripadvisor.com/Hotel_Review-g40379-d92936-Reviews-Quality_Inn_Suites_Port_Allen-Port_Allen_Louisiana.html
[96] https://www.tripadvisor.com/Hotel_Review-g60864-d93140-Quality_Inn-New_Orleans_Louisiana.html
[97] https://www.expedia.com/Toledo-Hotels-Quality-Inn-Alexis-Rd.h40044.Hotel-Reviews

- A November 2010 review of a Quality Inn in New Orleans, LA states "I stayed with a colleague for 1 night on a business trip in the area before checking into another hotel because I was disgusted. There were prostitutes working the hotel that knocked on our door and pretty sure drugs were being sold right out of the room beside mine."

- A May 2011 review of a Quality Inn in Atlanta, GA states "When the security lights went out a prostitute and several thugboys started working the parking lot of the hotel.. I specifically told the manager that I never want to stay away from security again."[98]

- An August 2011 review of a Quality Inn in New Orleans, LA states "We got a room in January 2011, on the ground floor, and it had a stench to it that smelled like someone forgot to take their clothes out of the washer. There were people going into the room next to us that were very suspicious. They were yelling & swearing and we think they were pimps or drug dealers, because we heard one of them yelling at a female telling her that "this is the way I make my money." Needless to say, we left and got our money back. Scary!"[99]

- March 2012 review of a Quality Inn in Payson, UT states "Dirty rooms, rude staff, worst hotel experience ever. And for some reason there were a lot of police cars in the parking lot and they were asking women if they were prostitutes. I wish I was making that up. Apparently it's a good place to get an afternoon delight and Payson is prostitute heavy. I'd never been to Payson before but I didn't think a small town would have this problem. I left as soon as I could in the morning to avoid any officers and/or prostitutes."[100]

- A February 2013 review of a Quality Inn in Downey, CA states "Be aware that there is the potential for some undesirable people around the property. One night we had a drunken woman screaming the the parking lot that she was going to kill herself. Two mornings later we saw what appeared to be a prostitute waiting for visitors in her room with the door proped open half way."[101]

- June 2013 review of a Quality Inn in Lester, PA states "You want a room in the front/lit area. Do NOT take a room in the back/unlit area. We parked there (briefly) and there were people on the balcony/aisle drinking. I mentioned this to the clerk and was told that the back of the building is for the cash customers. I am fairly sure he meant hookers."[102]

- July 2013 review of a Quality Inn in Fresno, CA states "I am pretty sure there was prostitute "working" from the parking lot and I believe she was using the hotel, ew! I

---

[98] https://www.expedia.com/Atlanta-Hotels-Quality-Inn-Atlanta-Northeast-I-85.h15487.Hotel-Reviews

[99] https://www.tripadvisor.com/Hotel_Review-g60864-d93140-Quality_Inn-New_Orleans_Louisiana.html

[100] https://www.yelp.com/biz/quality-inn-payson

[101] https://www.tripadvisor.com/Hotel_Review-g32308-d76773-Reviews-Quality_Inn_Near_Downey_Studios-Downey_California.html

[102] https://www.tripadvisor.com/Hotel_Review-g53021-d3491361-Reviews-Quality_Inn_Philadelphia_Airport-Lester_Pennsylvania.html

brought this to the staffs attention when we were checking out and she just looked at us and said " oh yeah".”[103]

- October 2013 review of a Quality Inn in Atlanta, GA states “…sketchy security foot patrol hookers come and go parking lot has sketchy characters at night recurring smell of drugs…”[104] Hotel management responded to this review on October 7, 2013.

- February 2014 review of a Quality Inn in San Diego, CA states “I had to stay here for a month for business costs. There was a hooker getting the work done on her what seemed as loud as possible as it happened on at least 5 occasions that woke me from mid sleep. The room had an awful dirty dingy Angel to it. Oh and btw it is located in pretty much a ghetto as with the hooker.”[105]

- April 2014 review of a Quality Inn in Charleston, SC states “We had a 2 inch gap underneath our door when it was completely shut, a spider was on the wall. Along with bugs in the framed art, there was obvious prostitution and a dead lizard in the corner. Never go here this place is horrid.”[106]

- November 2014 review of a Quality Inn in Vacaville, CA states “This place is a seedy as they come. Pulled up to the room after being on the road for 8 hrs with our kids and realized most of the clientele was either going to or coming from the shady bar in the parking lot. All night people were loud, I swear there was some prostitution going on. My kids were up scared from all the yelling. They finally fell asleep about 1am and thanks god they did bc around 3 the husband and I woke to very loud sex noises coming from the room next to ours.”[107]

- February 2015 review of a Quality Inn in Spokane, WA states “On the first weekend we were there and after returning to the hotel around 10:00 pm we were walking down the hallway entrance to the elevators and approaching us were three apparent prostitutes. The older one made the statement to the two younger ones that "you better not turn down anything tonight" end quote. They walked right by the front desk to get to the front exit door. Any facility that promotes and allows such things to occur in their family oriented facility is not where I will ever bring my family back again.”[108] Hotel management responded to this review on February 5, 2015.

- April 2015 review of a Quality Inn in Riverside, CA states “On our third night we were graced by a hooker and a John who didn't even know her name on the side of us. We heard multiple drug deals happen, and I'm not talking about weed... Then they started

[103] https://www.yelp.com/biz/quality-inn-and-suites-fresno-northwest-fresno
[104] https://www.tripadvisor.com/Hotel_Review-g60898-d86271-Reviews-Quality_Suites_Atlanta_Buckhead_Village_North-Atlanta_Georgia.html
[105] https://www.tripadvisor.com/Hotel_Review-g60750-d83092-Reviews-Quality_Inn_San_Diego_I_5_Naval_Base-San_Diego_California.html
[106] https://www.expedia.com/Charleston-Hotels-Quality-Inn-Charleston-Gateway.h24247.Hotel-Reviews
[107] https://www.yelp.com/biz/quality-inn-and-suites-vacaville?start=80
[108] https://www.tripadvisor.com/Hotel_Review-g58759-d225255-Reviews-or700-Quality_Inn_Downtown_4th_Avenue-Spokane_Washington.html

to fight loudly in the room then took it right outside of our door. I didn't know whether to call the cops or hit the floor."[109]

- May 2015 review of a Quality Inn in Winston Salem, NC states "Wasn't even there 5 minutes after checking in with my sons, when someone was soliciting prostitution to us. Mind you, my kids are 15 and 16 year olds. In other words offering us services."[110]

- September 2015 review of a Quality Inn in Killeen, TX states "I would recommend you stay far from this hotel! Also there is prostitution going on here and it harbors the wrong type of people."[111]

- February 2016 review of a Quality Inn in Hollywood, FL states "HOWEVER, The facility is crawling with prostitutes. They are in the lobby, pool area and common areas. They are not forward and didn't make any maneuvers but had my children been with me their major presence would have been extremely uncomfortable."[112]

119.    These reviews are limited representative examples. There are many similar online reviews for Choice branded hotels, and, on information and belief, there are additional similar reviews and other customer complaints from in and before A.G.B.'s trafficking period that are not currently available on the internet, but which Choice know about due to monitoring reviews for its branded hotels.

120.    Choice's public statements regarding trafficking confirm that it was, at all relevant times, aware of the problem in the hospitality industry and in its own hotels. For example:

- Choice's Board of Directors has been discussing human trafficking issues since at least 2008 when they adopted a Human Rights Policy that condemns human trafficking and publicly commits to raising awareness among hotel staff about trafficking in its hotels.

- In 2009, Choice faced public outcry including a Change.org petition as a result of the child sex trafficking occurring in its hotels. In 2010, the petition was updated to state "Choice Hotels has agreed to take important and proactive steps to protect children from child prostitution and sexual exploitation."[113]

---

[109] https://www.yelp.com/biz/quality-inn-riverside-near-ucr-and-downtown-riverside
[110] https://www.expedia.com/Winston-Salem-Hotels-Quality-Inn-University.h26374.Hotel-Reviews
[111] https://www.expedia.com/Killeen-Hotels-Quality-Inn.h4655354.Hotel-Reviews
[112] https://www.tripadvisor.ca/Hotel_Review-g34296-d313345-Reviews-
Quality_Inn_Suites_Hollywood_Boulevard-Hollywood_Broward_County_Florida.html
[113] https://www.change.org/p/tell-choice-hotels-to-prevent-child-prostitution-in-their-hotels

- Choice has publicly claimed that it started supporting Polaris, a leading non-profit in the fight against trafficking, in 2010. On information and belief, prior to A.G.B.'s trafficking period, Choice had reviewed and was familiar with Polaris publications regarding trafficking in the hospitality industry, which include detailed recommendations for how hotels can avoid facilitating trafficking.

- On information and belief, in November 2010, Choice publicly claimed to be partnering with ECPAT-USA to develop a training module to educate hotel management and staff in the prevention of sex trafficking. Unfortunately, Choice delayed for years before implementing anti-trafficking training at its hotels, at the expense of victims like A.G.B.

121. Despite its awareness of the problem of sex trafficking, Choice continued to operate in ways that it knew or should have known would facilitate ongoing sex trafficking at its hotels and, therefore, continued to financially benefit from the use of its hotels for the trafficking of victims.

122. News stories, online reviews, guest complaints, public statements, and law enforcement efforts establish that, at the time A.G.B. was trafficked at the Esters Property-Quality Inn, Choice knew or should have known:

a. The use of Choice branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

b. Commercial sex work occurring at Choice branded properties involved trafficking and compelled prostitution;

c. Choice franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at Choice hotel properties;

d. Their efforts, if any, to stop facilitating sex trafficking in Choice branded properties were not effective; and

e. Choice was, by acts and omissions, facilitating sex trafficking at Choice branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

123.    Despite the continually mounting evidence that sex trafficking at Choice branded properties was ongoing and growing,  Choice did not change course. Choice chose to continue earning revenue by allowing their hotels to serve as venues for trafficking.

**B. Choice and Choice Franchisee had actual and constructive knowledge of widespread and ongoing sex trafficking at the Esters Property-Quality Inn.**

124.    At all relevant times, Choice and Choice Franchisee also knew or should have known that sex trafficking was prevalent at the Esters Property-Quality Inn specifically because there was widespread sex trafficking on site that followed well-established patterns and presented with obvious signs that Choice and Choice Franchisee knew and acknowledged to be indicators of sex trafficking in a hotel environment.

125.    A.G.B. was aware that other victims were being trafficked at the Esters Property-Quality Inn, including by her own traffickers, and there were obvious signs of this activity consistent with industry-recognized "red flags" of trafficking.

126.    During her trafficking period, A.G.B.'s traffickers brought her to the Esters Property-Quality Inn repeatedly and regularly, typically staying for a week or two at a time and trafficking her there, including while she was a minor.

127.    During these stays, A.G.B. and her traffickers would interact with and be observed by members of the hotel staff, including the front desk staff and housekeeping staff. A.G.B. recalls that they would encounter the same staff members repeatedly. It was obvious to A.G.B. based on these repeated interactions that staff began to recognize her.

128.    During the period that A.G.B. was trafficked at the Esters Property-Quality Inn, there were obvious signs associated with her trafficking:

- The hotel rooms where she was trafficked were frequently paid for with cash.

51

- Although they would stay for a week or two at a time, A.G.B.'s trafficker would pay for the room daily, reupping the room using cash earned the previous day.

- A.G.B. was repeatedly trafficked at this hotel as a minor, starting when she was only 15, and she looked consistent with young age.

- A.G.B.'s trafficker required her to dress provocatively in clothing inappropriate for her age.

- A.G.B. would remain at Esters Property-Quality Inn for a week or two at a time, including on school days when it was obvious she should have been in school.

- A.G.B. was trafficked at his hotel often enough that staff began to recognize her on arrival.

- A.G.B. would show obvious signs of fatigue and sleep deprivation and would have a nervous demeanor.

- A.G.B.'s trafficker often trafficked another victim alongside A.G.B. at this hotel at the same time.

- Hotel staff would observe A.G.B., a minor, in the presence of her trafficker, a much older bearded man who dressed in a flashy manner and carried a gun, which was usually visible.

- A.G.B.'s trafficker drove noticeably flashy cars to the Esters Property-Quality Inn.

- A.G.B.'s trafficker would often rent two rooms at the same time.

- There were observable signs of drug use in the room where A.G.B. was trafficked, including use of marijuana.

- A.G.B. was frequently under the influence of drugs while at the Esters Property-Quality Inn.

- Extra towels were requested frequently.

- When hotel staff did enter A.G.B.'s room, they would observe excessive amounts of sex paraphernalia like condom wrappers and lubricant.

- A.G.B. was required to see an average of 8 to 10 johns each day when she was trafficked at the Esters Property-Quality Inn, and sometimes as many as 15 in a single day.

- There was heavy foot traffic in and out of A.G.B.'s room involving men who were not hotel guests. This traffic was visible to hotel staff. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

- A.G.B.'s trafficker would sometimes require her to go to meet johns and escort them to her room.

52

- A.G.B.'s trafficker would be on site at the Esters Property-Quality Inn to monitor her. She would have to walk her earnings to him in between seeing johns.

- Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

129.    Multiple employees at the Esters Property-Quality Inn, including management-level employees, observed or were made aware of these obvious signs of A.G.B.'s trafficking while acting within the scope and course of their employment.

130.    All knowledge from the staff and management at the Esters Property-Quality Inn is imputed to Choice Franchisee who, therefore, knew about or was willfully blind to the trafficking at the Esters Property-Quality Inn based on the direct observation of hotel staff and management. This knowledge is also imputed to Choice based on the existence of an agency relationship as alleged below in Section III(F).

131.    Choice Franchisee also had notice of the sex trafficking at the Esters Property-Quality Inn based on its:

a.    surveillance of the property;

b.    internal investigations;

c.    customer complaints and monitoring of guest feedback feedback;

d.    information received from law enforcement;

e.    and other sources of non-public information available to Choice Franchisee.

132.    Choice Franchisee also had constructive knowledge of the activity that resulted in the trafficking of A.G.B. at the Esters Property-Quality Inn because that activity was accompanied by sufficient recognized "red flags" of sex trafficking that it was readily detectable through the exercise of ordinary diligence. If Choice Franchisee had exercised reasonable prudence in

53

operating the Esters Property-Quality, they would not have benefited from the illegal activities of A.G.B.'s traffickers at this hotel.

133.    Choice also knew or should have known about the trafficking at the Esters Property-Quality Inn based on:

a.    the obligation of hotel staff and Choice Franchisee to report suspected criminal activity, including sex trafficking, to Choice;

b.    regular monitoring of online reviews;

c.    collection and monitoring of customer surveys and complaints;

d.    requiring that Choice Franchisee submit regular and detailed reports to Choice about day-to-day hotel operations;

e.    collecting and monitoring data about guests at the Esters Property-Quality Inn, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

f.    supervision over day-to-day operations of the Esters Property-Quality Inn through detailed information and extensive reports that it obtained through the property management system and other software systems it required franchisee to use and through which franchisee was obligated to allow Choice to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

g.    employing field-based personnel to work with hotels on operational issues, including those related to detection and deterrence of sex trafficking;

h.    maintaining unlimited right to inspect the Esters  Property-Quality Inn;

i.    information provided to Choice by law enforcement; and

j.    other sources of information that were available to Choice.

134.    On information and belief,  Choice were on notice of obvious "red flags" of numerous instances of sex trafficking occurring at the Esters Property-Quality Inn based on their supervision and monitoring of the property. As a result, Choice knew or should have known that the Esters Property-Quality Inn was facilFitating sex trafficking.

135. Choice had constructive knowledge of A.G.B.'s trafficking at the Esters Property–Quality Inn because the activity there was accompanied by numerous and obvious, industry-recognized red flags of sex trafficking, which any hotel exercising ordinary diligence would have detected and acted upon. Had Choice exercised ordinary prudence in the areas of hotel operations they controlled or in which they directly participated, they would not have benefited from the illegal activities of A.G.B.'s traffickers at the Esters Property–Quality Inn.

**C. Choice Franchisee facilitated the trafficking activity at the Esters Property-Quality Inn, including the trafficking of A.G.B.**

136. Choice Franchisee participated in the harboring of A.G.B. and other victims at the Esters Property-Quality Inn by continuing to provide rooms in which these victims were held, maintained, provided, despite at least willful blindness to the fact that sex trafficking was occurring at the Esters Property-Quality Inn.

137. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Esters Property–Quality Inn, Choice Franchisee continued renting rooms for use in trafficking, providing traffickers with a safe haven and operating the hotel in ways that enabled and facilitated sex trafficking activity.

138. Although the Choice Franchisee at least should have known of the activity that resulted in A.G.B.'s trafficking, it continued to rent rooms used for that trafficking.

139. Choice Franchisee further facilitated the trafficking of A.G.B. and other victims at the Esters Property–Quality Inn by:

    **a.** developing familiar relationships with A.G.B.'s traffickers, and creating an understanding that these traffickers could operate at the hotel without risk of interference;

    **b.** continuing to provide rooms, services, and assistance despite clear red flags of trafficking;

c.  observing A.G.B. in visible distress yet continuing to rent rooms used to traffic her;

d.  allowing a high volume of sex buyers, who were not registered hotel guests, to freely access the hotel without requiring identification or taking any other steps to log or track these unregistered visitors;

e.  supplying excessive quantities of towels and linens to accommodate the high volume of commercial sex occurring on site;

f.  employing inadequate practices for hiring, training, supervising, and disciplining staff on issues related to the detection of and response to signs of sex trafficking and related criminal activity;

g.  using inappropriate and inadequate policies and protocols for detecting, documenting, and escalating signs of sex trafficking;

h.  following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

i.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff; and

j.  providing these traffickers with the cover of a legitimate business where they could operate without having to divert significant time and resources to avoid detection or interference by hotel staff.

140.  Choice Franchisee's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including A.G.B.

141.  Choice Franchisee knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

56

**D. Choice facilitated the trafficking activity at the Esters Property-Quality Inn, including the trafficking of A.G.B.**

142.   Choice participated directly in aspects of the operation of the Esters Property-Quality Inn that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of A.G.B., as follows:

a.   assuming joint responsibility with the franchisee for detecting and preventing human trafficking at the hotel property;

b.   assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

c.   assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

d.   employing field-based associates who work with hotels on trafficking issues;

e.   assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

f.   establishing systems for guests to report security issues to Choice;

g.   requiring franchisees to provide Wi-Fi/internet access to guests;

h.   mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests;

i.   setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

j.   requiring franchisees to use a system to monitor and track housekeeping requests;

k.   setting policies for when and how housekeeping services are provided; and

l.   collecting and monitoring data that shows patterns of use of housekeeping services.

143.   Choice played a central role in renting rooms at the Esters Property-Quality Inn by, among other things:

a.   controlling all details of the guest reservation, check-in, and payment processes through its management of and control over all systems used for those processes and through its adoption and enforcement of detailed and specific policies dictating the means and methods used for the day-to-day implementation of these processes;

**b.** directly taking reservations for rooms at the Esters Property-Quality Inn and accepted payment for those rooms through a central reservation system ("CRS") that it controlled and operated;

**c.** making reservations and take payment for rooms at the Esters Property-Quality Inn without any involvement or approval by Choice Franchisee;

**d.** directly entering into agreements with third parties regarding the distribution of room inventory in its branded hotels, including its franchised hotels;

**e.** when a guest did not make a reservation in advance through the CRS, nonetheless controlling the specific process used to register a walk-in guest and generate a reservation for that guest;

**f.** setting or otherwise controlling room prices, required discounts, and reward programs;

**g.** controlling and maintaining ownership in all data related to room rentals;

**h.** controlling and restricting the ability of Choice Franchisee and hotel staff to refuse or cancel a reservation;

**i.** establishing detailed policies and protocols that dictated, step-by-step, everything that would happen from the time a guest arrived at the Esters Property-Quality Inn until they entered their guest room, including operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in;

**j.** requesting Choice Franchisees to use the Choice ADVANTAGE property management system, which was owned, maintained, and controlled by Choice  for virtually all aspects of hotel operations related to room rentals;  and

**k.** maintaining back-end access to the Choice ADVANTAGE property management system, which it used to collect, track, and report comprehensive information about each guest at the Esters Property-Quality Inn.

144.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Esters Property-Quality Inn, Choice continued renting rooms to traffickers pursuant to their venture, including the rooms used to sexually exploit A.G.B.

145.    Policies purportedly enacted and enforced by Choice to identify signs of sex trafficking and stop facilitating it were not properly implemented and/or enforced at the Esters Property-Quality Inn.

146.    On information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Esters Property-Quality Inn, including the activity that led to A.G.B.'s trafficking, Choice used its retained control over and direct involvement in hotel operations to facilitate trafficking, including by:

a.   adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including A.G.B.'s traffickers, to secure rooms without providing their own identifying information;

b.   adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including A.G.B.'s traffickers, to pay for rooms using non-traceable methods;

c.   adopting and enforcing training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

d.   adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

e.   providing traffickers continued access to Choice-maintained internet systems despite having or constructive knowledge this access was being used for advertising services related to their trafficking activities;

f.   adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Choice Franchisee and hotel staff related to human trafficking at the Esters Property-Quality Inn; and

g.   implicitly or explicitly encouraging Choice Franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

147.    A.G.B.'s traffickers were able to operate without interference and without making significant effort at a concealment during repeated visits to the Esters Property-Quality Inn over

59

an extended period because Choice adopted, implemented, enforced, and used policies and practices that facilitated sex trafficking and minimized the risk of detection and traceability.

148.    Choice's acts and omissions, which result from a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including A.G.B.

149.    Choice knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

### E.    Choice Franchisee and Choice's Ventures at the Esters Property-Quality Inn

150.    Choice Franchisee and Choice each benefited from use of the Esters Property-Quality Inn for sex trafficking. A.G.B.'s traffickers and other traffickers rented rooms at the Esters Property-Quality Inn and used the hotel to harbor, maintain, and provide victims including A.G.B. When these traffickers rented rooms, both Choice Franchisee and Choice received a financial benefit:

      a.    Choice Franchisee generated revenue every time a sex trafficker rented a room at the Esters Property-Quality Inn, both from room rental fees and from fees for other hotel services.

      b.    Choice generated substantial income from operation of the Esters Property-Quality Inn. As a result of its role in hotel operations, Choice received a share of the revenue from room rentals collected at the Esters Property-Quality Inn. The fees generated by Choice are primarily based on gross room rentals; therefore, Choice's revenue increased with each room rental at the Esters Property-Quality Inn.

      c.    Choice also benefited from sex traffickers' frequent use of the Esters Property-Quality Inn because this regular and routine use of the hotel increased the hotel occupancy rate, and an increase in the hotel occupancy rate resulted in several benefits for Choice, including that this assisted them in obtaining financing and helped them market franchising opportunities to potential franchisees.

151.    In ways more fully described above, Choice and Choice Franchisee knowingly benefited from participating in a venture with traffickers who regularly operated at the Esters Property-Quality Inn, including A.G.B.'s traffickers ("Venture 1").

152.    Both Choice and Choice Franchisee participated in this venture through their respective roles in the business relationship that formed between the Esters Property-Quality Inn and these traffickers. This business relationship involved mutual pursuit of benefit: Defendants earned revenue and other benefits from room rentals, while traffickers used those rooms to generate income from commercial sex. This business relationship developed as follows:

f.  A.G.B.'s trafficker operated out of hotels, such that a hotel venue where he could harbor, maintain, and provide A.G.B. and other victims was a crucial component of his business model.

g.  Choice Franchisee and Choice facilitated and enabled sex trafficking at the Esters Property-Quality Inn in the ways described above.

h.  A.G.B.'s trafficker came to understand that policies and practices at the Esters Property-Quality Inn would minimize the risk of detection and traceability, facilitating their operations.

i.  A.G.B.'s trafficker developed an understanding that hotel staff would turn a blind eye and thus were able to operate without diverting time and resources to avoiding inference by hotel staff.

j.  A.G.B.'s trafficker repeatedly returned to this same hotel and was able to attract business due to the low-risk environments for sex buyers.

153.    Choice Franchisee participated in this continuous business relationship through its "boots-on-the-ground" control over daily operations at the Esters Property–Quality Inn. Choice participated through their centralized control of reservations and their direct role in policies and training related to detecting and responding to sex trafficking as further described above.

154.    This continuous business relationship facilitated, assisted, and supported traffickers' illegal operations, including their trafficking of A.G.B. Together, Choice and Choice

61

Franchisee not only provided traffickers with a physical venue but also the cover of a legitimate business, enabling them to profit from sexual exploitation without meaningful risk of detection. Defendants also allowed unregistered male sex buyers to enter and exit freely without identification, helping traffickers attract customers and minimize law-enforcement exposure. The conduct of both Choice and the Choice Franchisee thus facilitated trafficking at the Esters Property–Quality Inn.

155.    In ways described more fully above, Choice and Choice Franchisee also knowingly benefited from participating together in a hotel-operating venture at the Esters Property-Quality Inn that facilitated ongoing sex trafficking, including the trafficking of A.G.B. (hereinafter "Venture 2").

156.    Venture 2 is a commercial hotel-operating venture that resulted from a longstanding business relationship between Choice Franchisee and Choice that centered on operation of the Esters Property-Quality Inn. This undertaking involved shared goals of maximizing gross room revenue and increasing room occupancy rates.

157.    Choice Franchisee Franchise and Choice each participated in this commercial undertaking through their respective roles in hotel operations as further described above. Each of these Defendants was directly involved in aspects of operations that facilitated sex trafficking at the hotel and continued to operate the hotel in the same manner despite actual or constructive knowledge that this was facilitating sex trafficking.

158.    There were TVPRA violations within the scope of Venture 2 because the hotel at the center of the venture, the Esters Property-Quality Inn, was used to harbor, maintain, provide, and exploit many trafficking victims, including multiple victims of A.G.B.'s traffickers and A.G.B.

62

herself. There were also TVPRA violations with the scope of Venture 2 through Choice Franchisee's violations of 18 U.S.C. §1591(a) as a perpetrator.

**F. Choice Franchisee and the Staff at the Esters Property-Quality Inn Acted as Actual Agents of Choice.**

159. Choice is vicariously liable for the acts, omissions, and knowledge of Choice Franchisee and hotel staff, which acted as Choice's actual agents or subagents when operating the Esters Property-Quality Inn.

160. Choice subjected and retained the right to subject the Choice Franchisee to detailed requirements regarding the operation of the Esters Property-Quality Inn. These detailed requirements came from written agreements, manuals, policies, protocols, directives, and mandates that Choice imposed through its ongoing control of hotel operations.

161. Choice obscure the full extent of control it exercises over the Choice Franchisee by treating these manual, policies, and directives as confidential and proprietary and guarding against public disclosure. On information and belief, the requirements that that Choice imposed on the Choice Franchisee:

      a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Choice Franchisee used at the Esters Property-Quality Inn, such as telling hotel staff step-by-step how to perform tasks at the hotel and mandating that Choice Franchisee Franchises use tools and products selected and controlled by Choice;

      b. covered virtually all aspects of hotel operations, including internal operating functions, such as human-resources issues and accounting and finance practices;

      c. dictated the specific ways that Choice Franchisee and hotel staff were required to carry out day-to-day functions;

      d. required the use of Choice's owned, operated and controlled reservation and operation systems software and hardware; and

63

e. significantly exceeded what was necessary for Choice to protect their trademarks.

162. In addition to the ways described above, on information and belief, Choice exercised and reserved the right to exercise systemic and pervasive control over Choice Franchisee's day-to-day operation of the Esters Property-Quality Inn, including in the following ways:

a. requiring Choice Franchisee and management of the Esters Property-Quality Inn to participate in mandatory training programs, both during onboarding and on an annual basis, including regarding aspects of hotel operations that go significantly beyond what would be necessary trademark protection;

b. retaining the right to mandate and control training for hotel staff and actually mandated and controlling training for hotel staff on topics it selected;

c. controlling the details of training conducted for hotel staff by Choice Franchisee by requiring the use of standardized training methods and materials, including developing online, role-specific training that Franchisees was required to use;

d. adopting detailed job descriptions for each position at the Esters Property-Quality Inn and drafting numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

e. setting required staffing levels for the Esters Property-Quality Inn;

f. exercising significant control over the procurement decisions of Choice Franchisee by requiring it to buy products from "qualified vendors" and limiting its ability to purchase products from other vendors;

g. imposing detailed requirements for all aspects of hotel facilities;

h. controlling channels for guests to report complaints or provide feedback regarding the Esters Property-Quality Inn and directly participating in the response and/or supervising and dictating Franchisee's response to customer complaints or other feedback;

i. requiring the Esters Property-Quality Inn to participate in a mandatory guest complaint resolution system operated, managed, and overseen by Choice;

64

j.  requiring Choice Franchisee to join and participate in a Franchisees association;

k.  controlling all marketing for the Esters Property-Quality Inn, including all website pages, and prohibited Franchisee from using any website, social media, advertising, or other public communication without written approval;

l.  requiring Choice Franchisee to refer all guests who it could not accommodate to other Choice hotels;

m.  requiring Choice Franchisee to purchase insurance and set specific requirements for that insurance;

n.  imposing detailed recordkeeping and reporting requirements on Franchisee regarding virtually all aspects of hotel operation;

o.  collecting and monitoring dozens of reports regarding the Esters Property-Quality Inn through the backend of the Choice Brand Choice ADVANTAGE property management system and used these reports to supervise and control the day-to-day operations of the Esters Property-Quality Inn;

p.  collecting, monitored, and analyzed guest information in two separate systems: the CIS (Customer Information System) and the GIS (Guest Insight System) through the backend of the Choice Brand Choice ADVANTAGE property management system and using this information to supervise the Esters Property-Quality Inn;

q.  retaining the virtually unlimited right to supervise the day-to-day operations of the Esters Property-Quality Inn by retaining the right to implement any automatic reporting systems it elected to use;

**r.**  retaining the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations;

s.  retaining the right to inspect the Esters Property-Quality Inn, including through unannounced inspections;

t.  retaining the right to impose penalties, including but not limited to written warnings, payment of re-inspection, non-compliance, and guest satisfaction fees, attendance at mandatory training programs and ultimately to the termination of the franchise agreement for violations of any rule, policy, or standard; and

u.  other actions that deprived Choice Franchisee of independence in the business operations of the Esters Property-Quality Inn.

163.    As further described above, Choice specifically retained and exercised control over the aspects of hotel operations at the Esters Property-Quality Inn that caused or contributed to A.G.B.'s harm, including but not limited to: rental of rooms, relevant policies (including payment method accepted, identification requirements, and hotel access for individuals who are not registered hotel guests) hotel security, employee training, and detection of and response to suspected sex trafficking.

## V.    A.G.B.'s Trafficking at the La Quinta Properties.

### A.  Sex Trafficking at La Quinta Hotels was well Known by the LQ  Defendants.

164.    The LQ Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. They have known, since well before A.G.B.'s trafficking that sex trafficking was ongoing and widespread at  La Quinta properties.

165.    Information that has become public through news stories establishes the entrenched and pervasive nature of the LQ Defendants' role in providing a venue where sex trafficking has continued unabated for years. The LQ Defendants monitored news stories and online reviews for indicia of criminal activity at their branded locations, including sex trafficking. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at La Quinta hotels:

- In 2009, an arrest was made at a La Quinta Inn in Cambridge where a man was forcing a woman into prostitution by threatening her with bodily harm.[114]

- In 2009, two were arrested on sex trafficking charges after recruiting women on line and then forcing them into prostitution at a New York La Quinta.[115]

---

[114] https://www.metrowestdailynews.com/story/bulletin-tab/2009/07/01/former-state-rep-s-son/65129427007/
[115] Lemire, Jonathan, *2 Busted in Craigslist Hooker Scam*, N.Y. Daily News, June 19, 2009, § News, at 45 (available on Lexis: https://plus.lexis.com/api/permalink/12e35fa6-a1f9-4c74-b379-8022a9110479/?context=1530671).

66

- In 2011, a woman was murdered at a Louisiana La Quinta by a sex buyer who had responded to an online advertisement.[116]

- In 2012, there was an arrest for child sex trafficking at an Oregon La Quinta.[117]

- In 2013, a man was arrested on juvenile sex trafficking charges for trafficking a minor out of hotels, including a Florida La Quinta.[118]

- In February 2013, police made arrests for a sex slavery ring running out of a La Quinta Inn near San Francisco International Airport.[119]

- In August 2013, a man was arrested and charged with trafficking offenses after dropping a 15-year-old girl at a La Quinta Inn in San Francisco.[120]

- In 2014, Raleigh police responded to the La Quinta Inn where a victim said she was forced into the commercial sex trade and discovered a family-run, multi-state sex trafficking ring that was operating at hotels.[121]

- In 2014, a 16-year-old trafficking victim was found by law enforcement with a 61-year-old man inside the La Quinta Inn in Tallahassee.[122]

- In 2013, a La Quinta Inn San Diego was sued by City Attorney's Office for its history of illegal activity. The hotel was "ordered to increase security after complaints of prostitution and nuisance activity. La Quinta Hotel…must now install more security cameras and signs to deter criminal activity. The hotel agreed to do this as part of a settlement with the San Diego City Attorney's office. The San Diego Police Department discovered prostitution at the hotel during several undercover sting operations. Court documents show multiple

---

[116] Ross, Bob, *Sex Workers Forgo Streets for Web; Three Victims Met Attacker Online*, *Times-Picayune* (New Orleans), Aug. 28, 2011, at A1 (available on Lexis: https://plus.lexis.com/api/permalink/21222757-a99c-4cd5-9798-c5223a58ef48/?context=1530671).

[117] McVicker, Laura, *Man Pleads Not Guilty to Child Sex-Trafficking Charge*, *The Columbian* (Vancouver, Wash.), Feb. 3, 2012, at C3 (available on Lexis: https://plus.lexis.com/api/permalink/a40bd3a4-442c-4c1c-9b47-566b433c087f/?context=1530671).

[118] Sullivan, Dan, *Fourth Arrested in Sex Trafficking*, *Tampa Bay Times* (South Pinellas ed.), May 23, 2013, at 3B (available on Lexis: https://plus.lexis.com/api/permalink/208b10e5-4276-4ac4-b945-5cfccc2e5c97/?context=1530671).

[119] https://www.huffpost.com/entry/south-san-francisco-sex-slavery_n_2734350

[120] https://www.sfgate.com/crime/article/How-girls-fall-into-clutches-of-pimps-4705407.php

[121] https://www.wral.com/larceny-call-unveils-family-run-sex-trafficking-ring/14031981/

[122] https://www.tallahassee.com/story/news/local/2014/06/02/sex-trafficking-arrests-tallahassee/9856065/

undercover operations where investigators said they arranged to meet at the hotel with prostitutes through websites."[123]

166.    These articles are only limited representative examples. There are many similar articles about sex trafficking and other associated criminal activity at La Quinta branded hotels. Moreover, on information and belief, the LQ Defendants are aware of additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media.

167.    Reviews of La Quinta branded properties, which on information and belief, each of the LQ Defendants, monitored regularly, also show both the pervasiveness of sex trafficking at La Quinta branded properties and the LQ Brand Defendants' knowledge of the same. For example:

- In a 2011 TripAdvisor review for a Texas La Quinta, a customer wrote, "The parking lot has no lighting and seems to be infested with drug dealers and prostitutes. Only problem was the rough location and sketchy people around."[124]

- In a 2011 Expedia review for a Texas La Quinta a customer wrote, "In the two days I stayed there I was approached by prostitutes twice.. Once as I got out of my car and another time at 2:00am in the morning beating on my door. There were drunken men with beer bottles standing in front of my room, blocking my way in."[125]

- A 2011 Expedia review for a Texas LaQuinta states "Their was drug deals going on in the parking lot and prostitutes walking in the parking lot. It was very noisy also. Worst hotel experience I have ever had."[126]

- A 2012 TripAdvisor review for a California La Quinta states: "The area seemed like a nice one, but I think the they are letting rooms out to prostitutes. Very questionable things going on and my family could not get over the smell."[127]

- A 2012 TripAdvisor review for a  California La Quinta states: "This is a meeting place for hookers. I went there for dinner and saw a steady stream of men coming in and out of the rooms. On asking, I found that they were

---

[123] https://www.nbcsandiego.com/news/local/la-quinta-hotel-rancho-penasquitos-san-diego-paseo-montril/2050904/
[124] https://www.tripadvisor.com/Hotel_Review-g56385-d105884-Reviews-La_Quinta_Inn_by_Wyndham_Odessa-Odessa_Texas.html
[125] https://www.expedia.co.in/Midland-Hotels-La-Quinta-Inn-By-Wyndham-Odessa.h25599.Hotel-Reviews
[126] https://www.expedia.com/Texarkana-Hotels-Magnuson-Hotel-Texarkana.h8371.Hotel-Reviews
[127] https://www.tripadvisor.com/Hotel_Review-g60959-d77912-Reviews-La_Quinta_Inn_Suites_by_Wyndham_Thousand_Oaks_Newbury_Park-Thousand_Oaks_California.html

there for hookups with the girls who make this their business address. The hotel management were completely uninterested in the report."[128]

- A 2012 Yelp review for a Utah La Quinta states: "The only bad thing was that when it starts getting dark! Prostitutes started almost every night to I guess to wait for clients!"[129]

- A 2013 TripAdvisor review for a California La Quinta stated: "There seems to be a "regular" crowd that hangs out at the hotel. Very sketchy looking people coming in and out, and looks like the place is their regular hangout. The room reeked of smoke, even though its non-smoking. And I often saw people hanging out their door smoking even though the building is non-smoking. I am fairly certain there was a prostitute next door as we heard men coming in and out all night - and a lot of "bed" activity."[130]

- A 2013 TripAdvisor review for a Texas La Quinta stated: "Prostitutes in the parking lot."[131]

- A 2013 TripAdvisor review for an Ohio La Quinta stated: "you walk in and it seems like they have prostitutes in the upper floors."[132]

- A 2013 TripAdvisor review for a California La Quinta states: "On our way back to the car, two hookers were entering the hotel (yes, a two year old could have identified them has hookers)"[133]

- A 2014 TripAdvisor review for a  Florida La Quinta states: "If you are a guest with a spouse or family with you- DO NOT stay @ this hotel. Between the drug dealers, street walkers you will have no peace. I was solicited 4 times by a street walker while outside smoking a cigarette. My wife was offered money or drugs on 2 different occasions while outside of the building on the property."[134]

- A 2014 Expedia review for a South Carolina La Quinta states: "The place is rundown, but our room was not bad. I was more concerned with the shenanigans that went on after dark there. Pretty sure they are running some kind of prostitution operation out of some of the rooms,"[135]

[128] https://www.tripadvisor.com/Hotel_Review-g60959-d77912-Reviews-La_Quinta_Inn_Suites_by_Wyndham_Thousand_Oaks_Newbury_Park-Thousand_Oaks_California.html
[129] https://www.yelp.com/biz/la-quinta-inn-by-wyndham-salt-lake-city-midvale-midvale
[130] https://www.tripadvisor.com.ph/Hotel_Review-g32530-d92503-i130156645-La_Quinta_Inn_Suites_Irvine_Spectrum-Irvine_California.html
[131] https://www.expedia.co.in/Midland-Hotels-La-Quinta-Inn-By-Wyndham-Odessa.h25599.Hotel-Reviews
[132] https://www.tripadvisor.com/Hotel_Review-g50470-d122228-Reviews-La_Quinta_Inn_by_Wyndham_Cleveland_Independence-Independence_Ohio.html
[133] https://www.tripadvisor.com/Hotel_Review-g32810-d78745-Reviews-La_Quinta_Inn_Suites_By_Wyndham_Oakland_Airport_Coliseum-Oakland_California.html
[134] https://www.tripadvisor.com/Hotel_Review-g34515-d620648-Reviews-La_Quinta_Inn_Suites_by_Wyndham_Orlando_South-Orlando_Florida.html
[135] https://www.expedia.com/Charleston-Hotels-Quality-Inn-Suites.h24056.Hotel-Reviews

- A 2014 Yelp review for a New York La Quinta states: "Interesting crowds especially on the weekends. Once we walked by the first floor and a group of people wearing cowboy hats and no shirts left their curtains open and were singing with guitars. I might have stayed to watch if they didn't appear to be high on meth :( If you're looking minimal standards, you will survive here for a couple of days. If you have money, don't be cheap and go somewhere that doesn't have prostitutes waiting by the back double doors."[136]

- A 2014 TripAdvisor review for a Florida La Quinta states: "Hookers are using it as a base of operations, and the old-style outdoor hallway layout puts all this action right outside your front door."[137]

168.    These reviews are limited representative examples. There are many similar online reviews for La Quinta branded hotels, and, on information and belief, there are additional similar reviews and other customer complaints from before A.G.B.'s trafficking period that are not currently available on the internet but which the LQ Defendants know about.

169.    News stories, online reviews, guest complaints, public statements, and law enforcement efforts establish that, at the time A.G.B. was trafficked at the Subject La Quinta Hotels, the LQ Defendants knew or should have known:

a.    The use of La Quinta branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

b.    Commercial sex work occurring at La Quinta branded properties involved trafficking and compelled prostitution;

c.    La Quinta franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at La Quinta hotel properties;

d.    Their efforts, if any, to stop facilitating sex trafficking in La Quinta branded properties were not effective; and

---

[136] https://www.yelp.com/biz/la-quinta-by-wyndham-white-plains-elmsford-elmsford
[137] https://www.tripadvisor.com/Hotel_Review-g34731-d240105-Reviews-La_Quinta_Inn_by_Wyndham_West_Palm_Beach_Florida_Turnpike-West_Palm_Beach_Florida.html

e.  They were, by their acts and omissions, facilitating sex trafficking at La Quinta branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

170.  Despite the continually mounting evidence that sex trafficking at La Quinta branded properties was ongoing and growing, the LQ Defendants did not change course. The LQ Defendants chose to continue earning revenue from use of their hotels as venues for trafficking.

**B. The LQ Defendants and LQ Franchisee had actual and constructive knowledge of widespread and ongoing sex trafficking at the Subject La Quinta Hotels.**

171.  At all relevant times, the LQ Defendants and LQ Franchisee also knew or should have known that sex trafficking was prevalent at the Subject La Quinta Hotels specifically because there was widespread sex trafficking on site that followed well-established patterns and presented with obvious signs that these Defendants knew and acknowledged to be indicators of sex trafficking in a hotel environment.

172.  A.G.B. was aware that other victims were being trafficked at each of the Subject La Quinta Hotels, including by her own traffickers.

173.  A.G.B.'s traffickers brought her to each of the Subject La Quinta Hotels repeatedly and regularly, typically staying for a week or two at a time and trafficking her there, including while she was a minor, before rotating her to the next of her traffickers' preferred hotels.

174.  During these stays, A.G.B. and her traffickers would interact with and be observed by members of the hotel staff, including the front desk staff and housekeeping staff. A.G.B. recalls that they would encounter the same staff members repeatedly. It was obvious to A.G.B. based on these repeated interactions that staff at each of the Subject La Quinta Hotels began to recognize her.

175.  During the period that A.G.B. was trafficked at the Subject La Quinta Hotels, there were obvious signs associated with her trafficking:

71

- The hotel rooms where she was trafficked were frequently paid for with cash.

- Although they would stay for a week or two at a time, A.G.B.'s trafficker would pay for the room daily, reupping the room using cash earned the previous day.

- A.G.B. was repeatedly trafficked at this hotel as a minor, starting when she was only 15, and she looked consistent with young age.

- A.G.B.'s trafficker required her to dress provocatively in clothing inappropriate for her age.

- A.G.B. would remain at each of the Subject La Quinta Hotels for a week or two at a time, including on school days when it was obvious she should have been in school.

- A.G.B. was trafficked at his hotel often enough that staff began to recognize her on arrival.

- A.G.B. would show obvious signs of fatigue and sleep deprivation and would have a nervous demeanor.

- A.G.B.'s trafficker often trafficked another victim alongside A.G.B. at these hotels at the same time.

- Hotel staff would observe A.G.B., a minor, in the presence of her trafficker, a much older bearded man who dressed in a flashy manner and carried a gun, which was usually visible.

- A.G.B.'s trafficker drove noticeably flashy cars to the Subject La Quinta Hotels.

- A.G.B.'s trafficker would often rent two rooms at the same time.

- There were observable signs of drug use in the room where A.G.B. was trafficked, including use of marijuana.

- A.G.B. was frequently under the influence of drugs while at the Subject La Quinta Hotels.

- Extra towels were requested frequently.

- When hotel staff did enter A.G.B.'s room, they would observe excessive amounts of sex paraphernalia like condom wrappers and lubricant.

- A.G.B. was required to see an average of 8 to 10 johns each day when she was trafficked at the Subject La Quinta Hotels, and sometimes as many as 15 in a single day.

- There was heavy foot traffic in and out of A.G.B.'s room involving men who were not hotel guests. This traffic was visible to hotel staff. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

72

- A.G.B.'s trafficker would sometimes require her to go to meet johns and escort them to her room.
- A.G.B.'s trafficker would be on site at the Subject La Quinta Hotels to monitor her. She would have to walk her earnings to him in between seeing johns.
- Other obvious signs of trafficking consistent with the *modus operandi* of her trafficker and which included well known "red flags" for trafficking in a hotel.

176. Multiple employees at the Subject La Quinta Hotels, including management-level employees, observed or were made aware of these obvious signs of A.G.B.'s trafficking while acting within the scope and course of their employment.

177. Multiple employees at the Subject La Quinta Hotels, including management-level employees, observed or were made aware of these obvious signs of A.G.B.'s trafficking while acting within the scope and course of their employment.

178. All knowledge from the staff at the Carpenter Freeway La Quinta is imputed to LQ Franchisee who thus knew about or was willfully blind to the trafficking at the Carpenter Freeway La Quinta based on the direct observation of hotel staff, including management-level staff. This knowledge is also imputed to the LQ Defendants based on the existence of an agency relationship as described below.

179. All knowledge from the staff at the Landmark La Quinta is imputed to the LQ Defendants who  operated collectively to employ, manage, and control the hotel staff and management and thus knew about or were willfully blind to the trafficking at the Landmark La Quinta based on the direct observation of hotel staff, including management-level staff.

180. LQ Franchisee also knew or should have known about the sex trafficking at the Carpenter Freeway La Quinta based on:

  a. surveillance of the property;

  b. internal investigations;

    c.   customer complaints;

    d.   monitoring of customer feedback;

    e.   information received from law enforcement; and

    f.   and other sources of non-public information available to LQ Franchisee.

181.    LQ Franchisee also had constructive knowledge of the activity that resulted in the trafficking of A.G.B. at the Carpenter Freeway La Quinta because that activity was accompanied by such recognized "red flags" of sex trafficking that it was readily detectable through the exercise of ordinary diligence. If LQ Franchisee had exercised reasonable prudence in operating the Carpenter Freeway La Quinta, it would not have benefited from the illegal activities of A.G.B.'s traffickers at this hotel.

182.    The LQ Defendants also knew or should have known about the trafficking at the Subject La Quinta Hotels based on:

    a.   the obligation of hotel staff to report suspected criminal activity, including sex trafficking, to the LQ Defendants;

    b.   the LQ Defendants' regular monitoring of online reviews;

    c.   the LQ Defendants' collection and monitoring of customer surveys and complaints;

    d.   the LQ Defendants' requirement that LQ Franchisee and hotel staff at the Landmark La Quinta submit regular and detailed reports to the LQ Defendants about day-to-day hotel operations;

    e.   the LQ Defendants' collection and monitoring of data about guests at Subject La Quinta Hotels, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

    f.   the LQ Defendants' unlimited right to inspect the Carpenter Freeway La Quinta;

    g.   the LQ Defendants' access to surveillance footage at the Landmark La Quinta;

    h.   information provided to the LQ Defendants by law enforcement; and

    i.   other sources of information that were available to the LQ Defendants.

183.    On information and belief, LQ Defendants were on notice of obvious "red flags" of numerous instances of sex trafficking occurring at the Subject La Quinta Hotels based on their supervision and monitoring of the properties. As a result, the LQ Defendants knew or should have known that the Subject La Quinta Hotels were facilitating sex trafficking.

184.    The LQ Defendants also had constructive knowledge of the activity that resulted in the trafficking of A.G.B. at the Subject La Quinta Hotels because that activity was accompanied by such recognized "red flags" of sex trafficking that a hotel using ordinary diligence would have detected or deterred such trafficking on its property. The LQ Defendants have constructive knowledge of A.G.B.'s trafficking because, if they had exercised ordinary prudence in areas of operations over which they retained control or in which they directly participated, they would have stopped benefiting from the illegal activities of A.G.B.'s traffickers at the Subject La Quinta Hotels.

### C. LQ Franchisee facilitated the trafficking activity at the Carpenter Freeway La Quinta, including the trafficking of A.G.B.

185.    LQ Franchisee participated in the harboring of A.G.B. and other victims at the Carpenter Freeway La Quinta by continuing to provide rooms in which these victims were held, maintained, provided, despite at least willful blindness to the fact that sex trafficking was occurring at the Carpenter Freeway La Quinta.

186.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Carpenter Freeway La Quinta, LQ Franchisee continued renting rooms for use in trafficking, providing traffickers with a safe haven and operating the hotel in ways that enabled and facilitated sex trafficking activity.

187.    Although LQ Franchisee at least should have known of the activity that resulted in A.G.B.'s trafficking, it continued to rent rooms used for that trafficking.

188.    LQ Franchisee further facilitated the trafficking of A.G.B. and other victims at the Carpenter Freeway La Quinta by:

a.  developing familiar relationships with A.G.B.'s traffickers, and creating an understanding that these traffickers could operate at the hotel without risk of interference;

b.  continuing to provide rooms, services, and assistance despite clear red flags of trafficking;

c.  observing A.G.B. in visible distress yet continuing to rent rooms used to traffic her;

d.  allowing a high volume of sex buyers, who were not registered hotel guests, to freely access the hotel without requiring identification or taking any other steps to log or track these unregistered visitors;

e.  supplying excessive quantities of towels and linens to accommodate the high volume of commercial sex occurring on site;

f.  employing inadequate practices for hiring, training, supervising, and disciplining staff on issues related to the detection of and response to signs of sex trafficking and related criminal activity;

g.  using inappropriate and inadequate policies and protocols for detecting, documenting, and escalating signs of sex trafficking;

h.  following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

i.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff; and

j.  providing these traffickers with the cover of a legitimate business where they could operate without having to divert significant time and resources to avoid detection or interference by hotel staff.

189.    LQ Franchisee's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including A.G.B.

190.    LQ Franchisee knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**D. The LQ Defendants facilitated the trafficking activity at the Subject La Quinta Hotels, including the trafficking of A.G.B.**

191.    On information and belief, each of the LQ Defendants participated in a hotel-operating venture that also included all staff of the Landmark La Quinta, and each LQ Defendant participated directly in renting rooms to traffickers and facilitating trafficking at the Landmark La Quinta:

a.  On information and belief, the Landmark La Quinta was directly operated and managed by the LQ Defendants pursuant to agreements between the LQ Property Defendants, who owned the property, and LQ Holdings, LQ Management, and LQ Franchising. On information and belief, there was a management agreement and a franchising agreement between these parties. LQ Management acted as the management arm and LQ Franchising acted as the franchising arm for La Quinta. LQ Holdings was the sole owner and controlled both entities. The LQ Property Defendant owned the property, benefited from revenue earned at the hotel, and acted jointly with the other LQ entities to operate the hotel.

b.  On information and belief, this arrangement was part of a single unified operation by the LQ Defendants. On information and belief, all LQ Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. On information and belief, the LQ Defendants acted jointly to own, operate, control, manage, and supervise the Landmark La Quinta. As an integrated enterprise and/or joint venture, the LQ Defendants, were separately and jointly responsible for compliance with all applicable laws.

c.  On information and belief, each of the LQ Defendants received a benefit when a room at the Landmark La Quinta was rented to traffickers. Each defendant received a financial benefit in the form of increased revenue pursuant to the terms of the management and franchising agreements in addition to other benefits.

77

    **d.** By participating in a venture that facilitated sex trafficking, each of the LQ Defendants benefitted by keeping operating costs low and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.

    **e.** On information and belief, LQ Management, LQ Franchising, and LQ Holdings were jointly responsible for the development of all policies and training for the Landmark La Quinta and for—together with LQ Property Defendant—performing and/or exercising control over day-to-day operations at the Landmark La Quinta.

    **f.** On information and belief, LQ Management, LQ Franchising, and LQ Holdings were the primary hotel operators of the Landmark La Quinta during the time of A.G.B.'s trafficking.

    **g.** On information and belief, LQ Management, LQ Franchising, and LQ Holdings provided and controlled the reservation system and were involved in the day-to-day operations of renting rooms at the hotel.

192. The LQ Defendants harbored and facilitated the providing, maintenance, and exploitation of A.G.B. and other victims of A.G.B.'s traffickers at the Landmark La Quinta when they, through hotel staff and management they employed continued to provide rooms where these victims were imprisoned and exploited despite actual knowledge of or willful blindness to the fact that these victims were being trafficked at the Landmark La Quinta.

193. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Landmark La Quinta, the LQ Defendants continued renting rooms to be used in sex trafficking, providing traffickers with a safe heaven, and operating the Landmark La Quinta in a way that enabled and facilitated sex trafficking activity.

194. Although the LQ Defendants knew or should have known about the activity that resulted in A.G.B. being trafficked, they continued to rent hotel rooms for and to facilitate that trafficking activity at the Landmark La Quinta.

195. The LQ Defendants also facilitated widespread trafficking at the Landmark La Quinta, including the trafficking of A.G.B., in ways including:

a.  developing relationships with multiple traffickers, including A.G.B.'s traffickers, and creating an understanding that these traffickers could operate at the hotel without risk of interference;

b.  maintaining an environment where criminal activity could occur without the need to make significant efforts to avoid detection;

c.  continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of A.G.B. and other victims;

d.  observing A.G.B. in obvious distress but continuing to rent rooms that were used to traffic her;

e.  allowing johns who were not registered hotel guests to freely access the hotel without requiring identification or any other method of tracking;

f.  providing excessive amounts of towels and linens that were used for the high volume of commercial sex that was occurring;

g.  using inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

h.  following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

i.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff; and

j.  providing these traffickers with the cover of a legitimate business where they could operate without having to divert significant time and resources to avoid detection or interference by hotel staff.

196.    The LQ Brand Defendants participated directly in aspects of the operation of the Carpenter Freeway La Quinta that influenced whether and to what extent trafficking occurred at these hotels, including but not limited to the trafficking of A.G.B., as follows:

a.  assuming joint responsibility with the franchisee for detecting and preventing sex trafficking at the hotel properties;

79

    **b.** assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity;

    **c.** assuming or retaining control over and responsibility for training hotel staff on detecting and responding to sex trafficking based on the well understood "red flags" or signs of sex trafficking;

    **d.** assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to sex trafficking;

    **e.** assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

    **f.** establishing systems for hotel staff and guests to report security issues to franchisor;

    **g.** requiring franchisees to provide Wi-Fi/internet access to guests;

    **h.** mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests;

    **i.** setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

    **j.** requiring franchisees to use a system to monitor and track housekeeping requests;

    **k.** setting policies for when and how housekeeping services are provided; and

    **l.** collecting and monitoring data that shows patterns of use or non-use of housekeeping services.

197.    The LQ Brand Defendants played a central role in renting rooms at the Carpenter Freeway La Quinta by, among other things:

    a. controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for guest reservation, check-in, and payment processes;

    b. controlling, overseeing and enforcing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification.

c.  requiring the franchisee to use the franchisor's centralized reservation system and preventing the franchisee from using any other system;

d.  reserving rooms and accept payments without requiring franchisee approval or involvement;

e.  controlling and restricting the ability of franchisee and staff to refuse or cancel a reservation.

f.  requiring the franchisee to use a software system operated and controlled by the franchisor for booking rooms and checking guests into rooms;

g.  requiring the franchisee to use a software system operated and controlled by the franchisor to process payments;

h.  requiring the franchisee to use a property-management system operated and controlled by the franchisor;

i.  requiring the franchisee to use a data-management system operated and controlled by the franchisor;

j.  ensuring that data related to each room reservation passes through systems owned, maintained, and managed by the franchisor;

k.  exercising control over the price of rooms;

l.  controlling all details of the customer loyalty program that the franchisee was required to implement;

m. setting detailed policies for the check-in process, including requirements for identification and payment methods;

n.  collecting guest data, requiring franchisees to report guest data, and reviewing and analyzing guest data, including names, payment information, reservation history, internet browsing data, and other details associated with their stay; and

o.  assuming sole ownership over all guest information.

198.    Despite having actual or constructive knowledge of sex trafficking at the Carpenter Freeway La Quinta, the LQ Defendants continued renting rooms to traffickers pursuant to their venture, including the rooms used to sexually exploit A.G.B.

81

199.    On information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Carpenter Freeway La Quinta, including the activity that led to A.G.B.'s trafficking, the LQ Brand Defendants used their retained control over and direct involvement in hotel operations to facilitate trafficking, including by:

a.    adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including A.G.B.'s traffickers, to secure rooms without providing their own identifying information;

b.    adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including A.G.B.'s traffickers, to pay for rooms using non-traceable methods;

c.    adopting and enforcing inadequate training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

d.    adopting and enforcing inadequate policies and protocols regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

e.    providing traffickers continued access to Franchisor-maintained wi-fi and internet systems despite having active or constructive knowledge this access was being used to facilitate their trafficking activities;

f.    adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking;

g.    implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

200.    The conduct of the LQ Brand Defendants in operating the Carpenter Freeway La Quinta facilitated widespread sex trafficking at the hotel, including the trafficking activities of A.G.B.'s traffickers. The specific ways that the LQ Brand Defendants facilitated sex trafficking at the Carpenter Freeway La Quinta —including but not limited to their policies and practices that allowed for non-traceable payment methods, their policies and practices that allowed traffickers to

82

rent rooms with providing their true identities, and their inadequate and inappropriate efforts at detection of and response to signs of sex trafficking—directly assisted and facilitated the activities of A.G.B.'s traffickers at this hotel and the trafficking of A.G.B.

201.    A.G.B.'s traffickers were able to operate without interference and without making significant effort at a concealment during repeated visits to the Carpenter Freeway La Quinta over an extended period because the LQ Brand Defendants adopted, implemented, enforced, and used policies and practices that facilitated sex trafficking and minimized the risk of detection and traceability.

202.    The LQ Defendants' acts and omissions, which result from a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including A.G.B.

203.    The LQ Defendants knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**E.    The Ventures of the LQ Franchisee and the LQ Brand Defendants at the Carpenter Freeway La Quinta.**

204.    LQ Franchisee and Choice each benefited from use of the Carpenter Freeway La Quinta for sex trafficking. A.G.B.'s traffickers and other traffickers rented rooms at the Carpenter Freeway La Quinta and used the hotel to harbor, maintain, and provide victims including A.G.B. When these traffickers rented rooms, both LQ Franchisee and LQ Brand Defendants received a financial benefit:

> d.    LQ Franchisee generated revenue every time a sex trafficker rented a room at the Carpenter Freeway La Quinta, both from room rental fees and from fees for other hotel services.

> e.    LQ Brand Defendants generated substantial income from operation of the Carpenter Freeway La Quinta. As a result of its role in hotel operations, LQ Brand Defendants received a share of the revenue from

room rentals collected at the Carpenter Freeway La Quinta. The fees generated by LQ Brand Defendants are primarily based on gross room rentals; therefore, LQ Brand Defendants' revenue increased with each room rental at the Carpenter Freeway La Quinta.

f.  LQ Brand Defendants also benefited from sex traffickers' frequent use of the Carpenter Freeway La Quinta because this regular and routine use of the hotel increased the hotel occupancy rate, and an increase in the hotel occupancy rate resulted in several benefits for LQ Brand Defendants, including that this assisted them in obtaining financing and helped them market franchising opportunities to potential franchisees.

205.  In ways more fully described above, LQ Brand Defendants and LQ Franchisee knowingly benefited from participating in a venture with traffickers who regularly operated at the Carpenter Freeway La Quinta, including A.G.B.'s traffickers ("Venture 1").

206.  Both LQ Brand Defendants and LQ Franchisee participated in this venture through their respective roles in the business relationship that formed between the Carpenter Freeway La Quinta and these traffickers. This business relationship involved mutual pursuit of benefit: Defendants earned revenue and other benefits from room rentals, while traffickers used those rooms to generate income from commercial sex. This business relationship developed as follows:

a.  A.G.B.'s trafficker operated out of hotels, such that a hotel venue where he could harbor, maintain, and provide A.G.B. and other victims was a crucial component of his business model.

b.  LQ Franchisee and LQ Brand Defendants facilitated and enabled sex trafficking at the Carpenter Freeway La Quinta in the ways described above.

c.  A.G.B.'s trafficker came to understand that policies and practices at the Carpenter Freeway La Quinta would minimize the risk of detection and traceability, facilitating their operations.

d.  A.G.B.'s trafficker developed an understanding that hotel staff would turn a blind eye and thus were able to operate without diverting time and resources to avoiding inference by hotel staff.

e.  A.G.B.'s trafficker repeatedly returned to this same hotel and was able to attract business due to the low-risk environments for sex buyers.

84

207.    LQ Franchisee participated in this continuous business relationship through its "boots-on-the-ground" control over daily operations at the Esters Property–Quality Inn. LQ Brand Defendants participated through their centralized control of reservations and their direct role in policies and training related to detecting and responding to sex trafficking as further described above.

208.    This continuous business relationship facilitated, assisted, and supported traffickers' illegal operations, including their trafficking of A.G.B. Together, LQ Brand Defendants and LQ Franchisee not only provided traffickers with a physical venue but also the cover of a legitimate business, enabling them to profit from sexual exploitation without meaningful risk of detection. Defendants also allowed unregistered male sex buyers to enter and exit freely without identification, helping traffickers attract customers and minimize law-enforcement exposure. The conduct of both LQ Brand Defendants and the LQ Franchisee thus facilitated trafficking at the Esters Property–Quality Inn.

209.    In ways described more fully above, the LQ Defendant and LQ Franchisee also knowingly benefited from participating together in a hotel-operating venture at the Carpenter Freeway La Quinta that facilitated ongoing sex trafficking, including the trafficking of A.G.B. (hereinafter "Venture 2").

210.    Venture 2 is a commercial hotel-operating venture that resulted from a longstanding business relationship between LQ Franchisee and LQ Brand Defendants that centered on operation of the Carpenter Freeway La Quinta. This undertaking involved shared goals of maximizing gross room revenue and increasing room occupancy rates.

211.    LQ Franchisee Franchise and LQ Brand Defendants each participated in this commercial undertaking through their respective roles in hotel operations as further described

85

above. Each of these Defendants was directly involved in aspects of operations that facilitated sex trafficking at the hotel and continued to operate the hotel in the same manner despite actual or constructive knowledge that this was facilitating sex trafficking.

212.    There were TVPRA violations within the scope of Venture 2 because the hotel at the center of the venture, the Carpenter Freeway La Quinta, was used to harbor, maintain, provide, and exploit many trafficking victims, including multiple victims of A.G.B.'s traffickers and A.G.B. herself. There were also TVPRA violations with the scope of Venture 2 through LQ Franchisee's violations of 18 U.S.C. §1591(a) as a perpetrator.

### F.    The LQ Defendants' Venture at the Landmark La Quinta.

213.    The LQ Defendants generated revenue every time a sex trafficker rented a room at the Landmark La Quinta, both from room rental fees and from fees for other hotel services. On information and belief, revenue generated from rooms rented at the Landmark La Quinta was distributed among the LQ Defendants, with each benefiting from each rental of a hotel room.

214.    As more fully described above, the LQ Defendants knowingly benefited from participating in a venture with sex traffickers who regularly operated at the Landmark La Quinta, including A.G.B.'s sex traffickers ("Venture 1").

215.    The traffickers developed a continuous business relationship with the Landmark La Quinta, and the LQ Defendants participated in this ongoing business relationship through their respective roles (as further described above) in hotel operations. This business relationship involved mutual pursuit of benefit: Defendants earned revenue and other benefits from room rentals, while traffickers used those rooms to generate income from commercial sex. This business relationship developed as follows:

   a.    A.G.B.'s trafficker operated out of hotels, such that a hotel venue where he could harbor, maintain, and provide A.G.B. and other victims was a crucial component of his business model.

    **b.** LQ Defendants facilitated and enabled sex trafficking at the Landmark La Quinta in the ways described above.

    **c.** A.G.B.'s trafficker came to understand that policies and practices at the Carpenter Freeway La Quinta would minimize the risk of detection and traceability, facilitating their operations.

    **d.** A.G.B.'s trafficker developed an understanding that hotel staff would turn a blind eye and thus were able to operate without diverting time and resources to avoiding inference by hotel staff.

    **e.** A.G.B.'s trafficker repeatedly returned to this same hotel and was able to attract business due to the low-risk environments for sex buyers.

216. This continuous business relationship facilitated, assisted, and supported the traffickers' illegal sex trafficking activities, including their trafficking of A.G.B. The LQ Defendants did not only provide these traffickers with a physical space (harboring) but also with the cover of a legitimate business as a venue where they could profit from sexual exploitation without significant risk of disruption by hotel staff and with minimal risk of detection and traceability. The LQ Defendants also allowed johns who were not registered hotel guests to come and go freely without any need to identify themselves. This helped the traffickers to attract business from sex buyers and to minimize risks of detection and traceability. The conduct of the LQ Defendants facilitated trafficking at the Landmark La Quinta.

217. The LQ Defendants knew or should have known that Venture 1 was engaged in violations of the TVPRA because victims were being harbored, maintained, provided, and exploited at the Landmark La Quinta by traffickers including A.G.B.'s traffickers.

218. In ways described more fully above, the LQ Defendants also knowingly benefited from participating together in a hotel-operating venture at the Landmark La Quinta that facilitated widespread sex trafficking, including the trafficking of A.G.B. (hereinafter "Venture 2").

219.    Venture 2 is a commercial venture that resulted from a longstanding business relationship between the LQ Defendants that centered on operation of the Landmark La Quinta. This undertaking involved shared goals of maximizing gross room revenue and increasing room occupancy rates.

220.    The LQ Defendants each participated in Venture 2 through their respective roles in hotel operations as further described above. Each of these Defendants was directly involved in aspects of operations that facilitated sex trafficking at the hotel and continued to operate the hotel in the same manner despite actual or constructive knowledge that this was facilitating sex trafficking.

221.    There were TVPRA violations within the scope of Venture 2 because the hotel at the center of the venture, the Landmark La Quinta, was used to harbor, maintain, provide, and exploit many trafficking victims, including multiple victims of A.G.B.'s traffickers and A.G.B. herself.

### G. LQ Franchisee and the Staff at the Carpenter Freeway La Quinta Acted as Actual Agents of the LQ Brand Defendants.

222.    The LQ Brand Defendants are vicariously liable for the acts, omissions, and knowledge of LQ Franchisee and hotel staff, which acted as the LQ Brand Defendants' actual agents or subagents when operating the Carpenter Freeway La Quinta.

223.    The LQ Brand Defendants subjected and retained the right to subject the LQ Franchisee to detailed requirements regarding the operation of the Carpenter Freeway La Quinta. These detailed requirements came from written agreements, manuals, policies, protocols, directives, and mandates that the LQ Brand Defendants imposed through its ongoing control of hotel operations.

224.    The LQ Brand Defendants obscure the full extent of control it exercises over the LQ Franchisee by treating these manual, policies, and directives as confidential and proprietary and guarding against public disclosure. On information and belief, the requirements that that the LQ Brand Defendants imposed on the LQ Franchisee:

    **a.** Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools LQ Franchisee used at the Carpenter Freeway La Quinta, such as telling hotel staff step-by-step how to perform tasks at the hotel and mandating that LQ Franchisee Franchises use tools and products selected and controlled by the LQ Brand Defendants.

    **b.** Covered virtually all aspects of hotel operations, including internal operating functions, such as human-resources issues and accounting and finance practices.

    **c.** Dictated the specific ways that LQ Franchisee and hotel staff were required to carry out day-to-day functions.

    **d.** Required the use of LQ Brand Defendants' owned, operated and controlled reservation and operation systems software and hardware.

    **e.** Significantly exceeded what was necessary for the LQ Brand Defendants to protect their trademarks.

225.    In addition to the ways described above, on information and belief, LQ Brand Defendants exercised and reserved the right to exercise systemic and pervasive control over LQ Franchisee's day-to-day operation of the Carpenter Freeway La Quinta, including the following ways:

    a.    requiring LQ Franchisee and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for protection of registered trademarks;

    b.    maintaining a team of regionally based trainers to provide training at branded hotels.

    c.    providing hotels staff with training they created through an online learning platform, they controlled and maintained, including training specific to hotel-based

jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

d.  controlling training provided by LQ Franchisee to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e.  retaining sole discretion to determine whether all training had been completed satisfactorily;

f.  requiring LQ Franchisee to participate in mandatory centralized services for day-to-day operation of the hotel;

g.  for certain products and services that franchisee was required to purchase to operate the hotel, designating approved vendors and prohibiting franchisee from purchasing goods and services from anyone other than an approved vendor;

h.  requiring franchisees to use its revenue management system, through which they dictated pricing and strategies to maximize revenue, and which gave it direct ability to supervise day-to-day operations at through the hotel through direct access to the system;

i.  setting required staffing levels;

j.  establishing detailed job descriptions for all positions in its branded properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

k.  controlling channels for guests to report complaints or provide feedback directly participating in the response and/or supervising franchisee's response to customer complaints or other feedback.

l.  generating reports and analysis of guest complaints and online reviews;

m.  setting detailed requirements for insurance that LQ Franchisee must purchase;

n.  exercising or retaining control over LQ Franchisee's day-to-day accounting and banking practices;

o.  regularly auditing the books and records of LQ Franchisee;

p.  controlling all marketing for LQ Franchisee, directly providing marketing services, and prohibiting LQ Franchise from maintaining any online presence unless specifically reviewed and approved;

q.  exercising or retaining control over all aspects of building and facility design;

90

r.  supervising and controlling day-to-day operations through detailed information and extensive reports that it obtained through the property management system and other software systems it required LQ Franchisee to use;

s.  requiring LQ Franchisee and hotel staff to implement a data system that gives the LQ Defendants real-time information that they can monitor on a day-to-day basis; and

t.  retaining the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

226.  As further described above, the LQ Brand Defendants specifically retained and exercised control over the aspects of hotel operations at the Carpenter Freeway La Quinta that caused or contributed to A.G.B.'s harm, including but not limited to: reservations of rooms, relevant policies (including payment method accepted, identification requirements, and hotel access for individuals who are not registered hotel guests) hotel security, employee training, guest and hotel staff reporting of security issues, and detection of and response to suspected sex trafficking. The LQ Brand Defendants had the right to exercise detailed, day-to-day control over and involvement in these areas. They also regularly and closely monitored these areas.

**H.  The LQ Brand Defendants are jointly responsible for the trafficking of A.G.B.**

227.  On information and belief, the rights and obligations regarding the operation, franchising, and control of the Subject LQ Hotels were shared and fulfilled jointly by the LQ Brand Defendants and/or their predecessors for which they are liable.

228.  On information and belief, each of the LQ Brand Defendants shared revenue related to operation, franchising, and control of the Subject LQ Hotels, and each of the LQ Brand Defendants experienced a direct benefit from the rental of rooms to traffickers at the Subject LQ Hotels.

229.    On information and belief, the LQ Brand Defendants were corporate affiliates subject to common ownership and control.

230.    On information and belief, the LQ Brand Defendants shared office space, officers and directors, employees, management,  tools, information systems, and policies.

231.    On information and belief, operation of the Subject LQ Hotels was part of a single unified operation by LQ Brand Defendants

232.    On information and belief, each of the LQ Brand Defendants or their predecessor entities for which they are liable jointly fulfilled obligations under the franchising agreement with LQ Franchisee and acted together to provide operational services and oversight at each of the Subject LQ Hotels.

### CAUSES OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

233.    A.G.B. incorporates all other allegations.

**I.    Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Ramada Inn Franchisee, Choice Franchisee, and LQ Franchisee)**

234.     A.G.B. is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

235.    Ramada Inn Franchisee, Choice Franchisee, and LQ Franchisee are perpetrators within the meaning of 18 U.S.C §1595(a) because each of them:

   a.    knew about or was willfully blind to the activity leading to A.G.B.'s trafficking  at its respective hotel because they directly observed the obvious "red flags" of this trafficking activity;

   b.    violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored individuals (including A.G.B.) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at their respective hotel.

92

    c.  violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that trafficked victims including A.G.B.

## II.    Cause of Action: Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants).

236.    A.G.B. is a victim of sex trafficking within the meaning of 18 U.S.C. §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C. §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA. A.G.B. is a victim of sex trafficking under 18 U.S.C. §§ 1591 and 1595(a) and is thus entitled to bring a civil action against any beneficiary who knowingly benefited from participation in a venture that the beneficiary knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

237.    All Defendants are liable as beneficiaries under 18 U.S.C. § 1595(a).

238.    **Venture 1:** Through acts and omissions more fully described throughout this Complaint, each Defendant received a financial benefit from participating in a venture with A.G.B.'s traffickers and other traffickers who regularly operated at that Defendant's respective hotel(s).

    a.  Venture 1 resulted from the development of a continuous business relationship between these traffickers and each of the Subject Hotels, which formed when these hotels continued renting these traffickers rooms despite the obvious "red flags" of their sex trafficking activity and created an environment at the Subject Hotels that facilitated their trafficking activities.

    b.  Each Defendant directly participated in this ongoing business relationship through their respective roles in operations—and specifically those aspects of operations that facilitated sex trafficking—at their respective hotel(s). Through their participation, each Defendant facilitated and supported the activities of sex traffickers of A.G.B. and other traffickers at their respective hotel(s).

c. Each Defendant benefited from its participation in this venture because it received increased revenue and other benefits described above when rooms at the respective hotel(s) were rented to traffickers, including A.G.B.'s traffickers.

d. This venture violated the TVPRA through the conduct of the traffickers who repeatedly harbored, maintained, provided, and exploited victims, including A.G.B., at the Subject Hotels.

e. Each of the Defendants knew or should have known that Venture 1 was engaged in violations of the TVPRA based on the "red flags" associated with the illegal activities of A.G.B.'s traffickers and other traffickers regularly operating at the the Defendant's respective hotel(s) and because this trafficking would have been detected if the Subject Hotels had been operated using reasonable diligence.

239.    **Venture 2**: Through the acts and omissions more fully described above, each Defendant also participated in a commercial hotel-operating venture that facilitated widespread sex trafficking at its respective hotel(s):

a. Venture 2 is a commercial venture resulting from the business relationship between the entities involved in operation of each of the Subject Hotels for the mutual purpose of maximizing revenue, including gross room revenue.

b. Each Defendant participated in this venture through its role in operating its respective hotel(s) in ways that it knew or should have known was facilitating sex trafficking.

c. The Wyndham Brand Defendants, Choice, and the LQ Defendants also participated in this venture by (1) continuing the ongoing business relationship with its respective franchisee despite actual or constructive knowledge the hotel was facilitating sex trafficking; (2) directly involving themselves in and supporting aspects of hotel operations that they knew or should have known were facilitating trafficking at the hotel in ways described above; and (3) continuing to lend the perceived legitimacy of their brand and provide marketing services for the hotel after they knew or should have known the venture was engaged in violations of the TVPRA.

d. Each Defendant benefited from participating in Venture 2 as each derived revenue and other benefits from each room rented to a sex trafficker at its respective hotel(s), including the rooms rented to the traffickers of A.G.B.

e. Venture 2 violated the TVPRA through the widespread sex trafficking that occurred at each of the Subject Hotels as victims—including A.G.B.—were harbored, maintained, provided, and exploited at each of these hotels. This venture also violated the TVPRA through the conduct of Ramada Inn Franchisee, Choice Franchisee, and LQ Franchisee, each of whom violated 18 U.S.C. §1591(a) as perpetrators.

94

f.  Each Defendant knew or should have known that this hotel-operating venture was facilitating sex trafficking, including the activities of the traffickers of A.G.B.

**III.  Cause of Action: Liability under 18 U.S.C. § 2255 (all Defendants).**

240.  While a minor, A.G.B. was a victim under 18 U.S.C. §1591 and is thus entitled to bring a civil action under 18 U.S.C. § 2255.

241.  Ramada Inn Franchisee, Choice Franchisee, and LQ Franchisee are each liable to Plaintiff under 18 U.S.C. § 2255 because, as alleged above, each is a perpetrator under 18 U.S.C. §1591.

242.  Each of the Defendants are liable to A.G.B. under 18 U.S.C. § 2255 because, as alleged above, each Defendant is liable as a beneficiary under 18 U.S.C. §1595(a).

**IV.  Cause of Action: Vicarious Liability for TVPRA Violations (the Wyndham Brand Defendants, Choice, and the LQ Brand Defendants).**

243.  An agency relationship existed between the Wyndham Brand Defendants and Ramada Inn Franchisee because, through the acts and omissions described more fully above, the Wyndham Brand Defendants exercised and retained the right to exercise pervasive control over Ramada Inn Franchisee and its operation of the Esters Property-Ramada Inn, including the means and methods they used for day-to-day operations of the hotel.

244.  An agency relationship also existed between the Wyndham Brand Defendants and Ramada Inn Franchisee because the Wyndham Brand Defendants retained and exercised control over the specific aspects of hotel operations that caused A.G.B.'s harm.

245.  An agency relationship existed between Choice and Choice Franchisee because, through the acts and omissions described more fully above, Choice exercised and retained the right to exercise pervasive control over Choice Franchisee and its operation of the Esters Property-Quality Inn, including the means and methods they used for day-to-day operations of the hotel.

246.    An agency relationship also existed between Choice and Choice Franchisee because Choice retained and exercised control over the specific aspects of hotel operations that caused A.G.B.'s harm.

247.    An agency relationship existed between the LQ Brand Defendants and LQ Franchisee because, through the acts and omissions described more fully above, the LQ Brand Defendants exercised and retained the right to exercise pervasive control over LQ FRANCHISEE and its operation of the Carpenter Freeway La Quinta, including the means and methods they used for day-to-day operations of the hotel.

248.    An agency relationship also existed between the LQ Brand Defendants and LQ Franchisee because the LQ Brand Defendants retained and exercised control over the specific aspects of hotel operations that caused A.G.B.'s harm.

249.    Ramada Inn Franchisee, Choice Franchisee, and LQ Franchisee each committed TVPRA violations—as both beneficiaries and perpetrators—and violations of 18 U.S.C. § 2255 within the scope of its agency relationship with its respective principle. Specifically, each of these Defendants committed these violations while renting rooms at the hotel and operating the hotel in a manner that facilitated sex trafficking. This results in vicarious liability for the principles: the Wyndham Brand Defendants, Choice, and the LQ Brand Defendants.

250.    Moreover, each of the Wyndham Brand Defendants is liable for the acts and omissions of the other Wyndham Brand Defendants with respect to the operation and franchising of the Esters Property-Ramada Inn. On information and belief, the Wyndham Brand Defendants, who were corporate affiliates subject to common ownership and control and who shared employees and a single corporate headquarters, operated as a joint venture engaged in profit sharing and subject to mutual control regarding the operation of the Esters Property-Ramada Inn. They

operated as a single integrated enterprise and as alter-egos and/or agents of one another with respect to operation of the Esters Property-Ramada Inn, making them vicariously liable for one another.

251.    Moreover, each of the LQ Brand Defendants is liable for the acts and omissions of the other LQ Brand Defendants with respect to the operation, management, and control of the Subject LQ Hotels. The LQ Brand Defendants, who were corporate affiliates subject to common ownership and control and who shared employees and a single corporate headquarters, operated as a joint venture engaged in profit sharing and subject to mutual control regarding the operation of the Subject LQ Hotels. They operated as a single integrated enterprise and as alter-egos and/or agents of one another with respect to operation of the Subject LQ Hotels, making them vicariously liable for one another.

## DAMAGES

252.    A.G.B. sustained legal damages as a result of being the victim of sex trafficking under the TVPRA.

253.    Defendants are joint and severally liable for all past and future damages sustained by A.G.B.

254.    A.G.B. is entitled to be compensated for personal injuries and economic damages, including:

    a.  Actual damages (until trial and in the future)

    b.  Incidental and consequential damages (until trial and in the future);

    c.  Mental anguish and emotional distress damages (until trial and in the future);

    d.  Lost earnings and lost earning capacity (until trial and in the future);

    e.  Necessary medical expenses (until trial and in the future);

    f.   Life care expenses (until trial and in the future);

    g.   Physical pain and suffering (until trial and in the future);

    h.   Physical impairment (until trial and in the future);

    i.   Emotional impairment (until trial and in the future);

    j.   Exemplary/Punitive damages;

    k.   Attorneys' fees; and

    l.   Costs of this action.

    m.   Pre-judgment and all other interest recoverable.

## JURY TRIAL

255.   A.G.B. demands a jury trial on all issues.

## RELIEF SOUGHT

256.   WHEREFORE, A.G.B. prays that this case be set for trial before a jury and that, on a final hearing of the cause, judgment be entered for A.G.B. against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which A.G.B. may, in law or in equity, show herself to be justly entitled

        Respectfully submitted,

        **PROVOST ✶ UMPHREY LAW FIRM, L.L.P.**

        By: */s/ Bryan O. Blevins, Jr.*
        BRYAN O. BLEVINS, JR.
        Texas Bar No. 02487300
        MATTHEW C.  MATHENY
        Texas Bar No. 24039040
        COLIN D. MOORE
        Texas Bar No. 24041513
        CLAIRE BROWN

Texas Bar No. 24108010
350 Pine Street, Ste. 1100
Beaumont, TX 77701
(409) 835-6000 Telephone
bblevins@pulf.com
mmatheny@pulf.com
cmoore@pulf.com
cbrown@pulf.com

**ATTORNEYS FOR PLAINTIFF**